Dora Garcia CISNEROS, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–94–202–CR.

Court of Appeals of Texas,
Corpus Christi.

Jan. 25, 1996.

J.A. Canales, Jo Ellen Hewins, Corpus Christi, David L. Botsford, Botsford & Sauer, Austin, for appellant.

Luis V. Saenz, John A. Olson, Brownsville, for appellee.

Before DORSEY, YAÑEZ and CHAVEZ, JJ.

## OPINION

CHAVEZ, Justice.

A jury found appellant guilty of capital murder and assessed her punishment at life in prison. Appellant contends in her fourth point of error that the evidence is insufficient to support the conviction. We agree and acquit.

█ In reviewing the sufficiency of the evidence, an appellate court views the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense, as incorporated into the charge, beyond a reasonable doubt. *Arceneaux v. State*, 803 S.W.2d 267, 270–71 (Tex.Crim.App.1990).

The application paragraph of the charge read as follows:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 3rd day of March, 1993, in Cameron County, Texas, the defendant, Dora Garcia Cisneros, did intentionally cause the death of Albert Joseph Fischer Jr., for remuneration in that she did then and there, with the specific intent to cause the death of Albert Joseph Fischer Jr., employ another, Israel Olivarez or Heriberto Puentes Pizaña to intentionally murder Albert Joseph Fischer Jr., by shooting him with a firearm, and that another, Israel Olivarez or Heriberto Puentes Pizaña did agree with Dora Cisneros to intentionally murder Albert Joseph Fischer Jr., for such remuneration, and that pursuant to such agreement, the defendant, Dora Garcia Cisneros, then and there paid or promised to pay remuneration for intentionally murdering Albert Joseph Fischer Jr., and that thereafter, pursuant to such agreement and employment, another, Israel Olivarez or Heriberto Puentes Pizaña, in Cameron

County, Texas, on or about the 3rd day of March 1993 did intentionally murder Albert Joseph Fischer Jr., by shooting him with a firearm, for such remuneration, then you will find the defendant, Dora Garcia Cisneros, guilty of capital murder as charged in the indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of capital murder and next consider the lesser included offense of murder.

■ Appellant specifically contends that the evidence is insufficient to prove 1) that she employed Olivarez or Pizaña to murder Fischer and 2) that Olivarez or Pizaña murdered Fischer. We agree. First, we note that the application paragraph in the court's charge to the jury does not contain instructions regarding the law of parties with respect to appellant's alleged employment of Olivarez or Pizaña. In order for the jury to be authorized to convict one as a party to an offense, the law of parties must be incorporated within the application paragraph of the jury charge. *Biggins v. State*, 824 S.W.2d 179, 180 (Tex.Crim.App.1992); *Walker v. State*, 823 S.W.2d 247, 248 (Tex.Crim.App. 1991); *Jones v. State*, 815 S.W.2d 667, 670 (Tex.Crim.App.1991).

■ The record shows that appellant and Daniel Garza were indicted and jointly tried for the capital murder of Fischer, a high school senior and the former boyfriend of appellant's teenage daughter, Cristina. Fischer was killed on the morning of March 3, 1993, when he was shot in the head and chest while standing in his family's driveway in the Town of Rancho Viejo in Cameron County. Family members heard gunshots but did not witness the killing. Fischer's brother saw a white car speed away but could not identify the car or its occupant or occupants. The police were immediately summoned and arrived at the crime scene within minutes. Fischer was already dead when the first officers arrived. A business card from a Dallas area bail bond company was found next to Fischer's body.

About a month after the shooting, the investigators' trail led them to Daniel Garza, a San Antonio man with ties to the Brownsville area. Garza admitted his involvement in the killing and gave a written statement to the police on March 31, 1993. The statement was admitted in evidence during appellant's joint trial with Garza. Garza, however, did not testify and the trial court instructed the jury not to consider Garza's statement as any evidence whatsoever against appellant.

Garza was not immediately arrested after giving the statement because the police needed his cooperation in the continuing investigation. Thus, after obtaining Garza's written statement, the police asked him to meet with Maria Martinez, an elderly woman who Garza said participated in the conspiracy to murder Fischer. Garza cooperated, and three subsequent conversations between Garza and Martinez were monitored and tape recorded by investigators. Recordings of these conversations were admitted in evidence during the trial, but the court instructed the jury that these recordings were admitted solely for the case against Garza and could not be considered as evidence against appellant. After Garza and Martinez talked these several times, Martinez was arrested. Martinez then agreed with the investigators to meet with appellant. The meeting between Martinez and appellant was monitored and tape recorded by investigators. The recording of this meeting was admitted as evidence solely for the case against appellant.

At the trial, Martinez was the State's key witness.[1] In her testimony, Martinez described herself as the owner of a secondhand clothing store in Brownsville and admitted that she also read Mexican cards, gave advice, and prepared potions for people seeking cures to their problems. Martinez testified that Garza, whom she referred to as "Guero," initially visited her because of some family problems. Although she could not recall when Garza first visited her, it is clear that both Garza and appellant were seeking Martinez's help for their respective problems during the fall of 1992. Garza made several trips to Martinez' store in an effort to find a solution to his family problems. Martinez, in

1. The jury was instructed that Martinez was an accomplice witness as a matter of law.

turn, prepared oils mixed in holy water for Garza to use. These mixtures were supposed to bring him good luck in the resolution of his problems.

Martinez testified that appellant came to her for a reading of the cards, seeking answers about the relationship between her daughter Cristina and her Anglo boyfriend, whose name she did not disclose. Martinez did not identify the time when this meeting occurred. When Martinez told appellant that the boy was "very far away" from her daughter, appellant appeared very serious and a little bit angry. High school friends of Fischer and Cristina testified that Fischer and Cristina had gone to Fischer's junior prom together but had broken off their relationship sometime during the summer of 1992. Evidence from other sources showed that appellant had attempted persistently to find ways to get Fischer to continue dating her daughter.

Martinez testified that during her second meeting with appellant, appellant asked her to cast a spell on Fischer. Appellant told her that she wanted something bad to happen to Fischer or for Fischer to get killed. When Martinez told appellant that she did not know how to cast that type of spell, appellant got upset and left her store. Four or five days later, appellant called Martinez and asked her to pray that Fischer would go back to her daughter. At a meeting before Halloween 1992, appellant told Martinez that she wanted Martinez to get some guys "to do a little job" for her. Appellant did not elaborate and left the store.

Garza, in his statement which the jury was instructed not to consider against appellant, stated that Martinez approached him on one of his visits about doing "the job" for appellant. At first, Garza declined to help, but he later agreed when Martinez promised that Garza's assistance would cure his family problems.[2] On Halloween, appellant left an envelope in Martinez's store for Martinez to give to the man who was going to do the job.

Without opening the envelope, Martinez gave it to Garza. When Garza opened it, Martinez saw that the envelope contained a photo of a boy and some papers. Garza told Martinez that he would "take care of the guys" and left. Martinez testified that appellant did not know Garza. In referring to appellant, she only told Garza that it was a lady who wanted a job done, but she never revealed appellant's real name to Garza. Martinez only referred to appellant as "La Clienta" ("the customer").

Martinez testified that during November 1992, appellant repeatedly contacted her to find out what was going on regarding the job. During one conversation, appellant warned Martinez to be very careful, to say nothing about the envelope, and to keep her mouth shut. Appellant told Martinez, on another occasion, to tell the man that she wanted the boy really dead. During November, Garza also contacted Martinez, though only periodically. During one such contact, Martinez passed along appellant's message "to kill him." Garza told Martinez to let the lady know that he was taking care of the guys.

Appellant did not contact Martinez much during the month of December, but did on several occasions during the month of January. Appellant was upset because nothing was happening. During one discussion, appellant told Martinez that "the Gringo" had raped her daughter.[3] Appellant again told Martinez to tell Garza that she wanted the boy "really dead." Appellant further requested that the killer take the boy's ring and wallet to prove that he was really dead. Garza was busy in Dallas during January but told Martinez that he would come, presumably to Brownsville at some later date.

During February, appellant continued to contact Martinez to find out what was happening. Appellant wanted to know when, according to Martinez, "they would finish him up." Appellant also told Martinez that she was going to pay $3,000. Martinez,

---

2. We refer to information obtained from Garza's statement to clarify Martinez's testimony and place it in context. Although the jury was instructed not to consider Garza's statement as evidence against appellant, we take some liberty in using facts from Garza's statement since we find the evidence insufficient to sustain appellant's conviction.

3. Cristina testified that she never had sexual relations with Joey.

meanwhile, continually told appellant that she did not know when the job would be done.

On March 3, 1993, around 8:00 a.m., Garza called Martinez and told her to tell the lady that the job was done. Garza also told Martinez that he would come over to get the money. Martinez, in turn, told Garza that she would let appellant know that the job was done. A short while later, appellant telephoned Martinez, as she frequently did, and Martinez told her the job was done. Martinez testified that after she told her the job was done, appellant said, "Oh, yes, yes, yes, yes. I'll be right over. I'll be right over." About ten minutes later, appellant arrived and gave Martinez an envelope which she kept until Garza arrived later that day. Appellant again warned Martinez not to say anything. Martinez saw Garza open the envelope and count new hundred dollar bills. Garza then told her he was going to "go pay the guys," who were "in the hotel."

Martinez did not hear from Garza again until the end of March. When she did, Garza told Martinez that the other guys wanted more money. This discussion occurred after Garza confessed to the police and offered to cooperate in apprehending appellant. Later, when appellant next called, Martinez told her that Garza wanted more money. On Monday, April 6, appellant called to tell Martinez that she would be bringing more money early the next morning. Late on Monday, April 6, Martinez was arrested after her initial conversations with Garza had been tape-recorded. After being interviewed by the investigators, Martinez also agreed to cooperate with them. In doing so, she agreed to wear a hidden microphone on her body so that the police could monitor her scheduled meeting with appellant. Early on the morning of April 7, appellant called Martinez and told her they would go for a ride. Appellant arrived as promised, picked up Martinez, and drove around Brownsville while the monitoring police unit tried to stay within range of Martinez's transmitter. While Martinez testified at trial about her meeting with appellant as re-flected by the tape recording, only portions of their meeting were recorded because the police vehicle recording the meeting was periodically out of range of Martinez's transmitter. During the ride, appellant gave Martinez an envelope with five hundred dollars.

The ride ended when the police stopped appellant's vehicle and arrested her. One of the arresting officers testified that appellant referred to the money by saying, "That was some money that I owed her (Martinez)." Martinez, however, testified that appellant did not owe her any money.

At trial, the State introduced bank records showing that appellant had obtained $5,000 cash from a bank account in July 1992 and accessed her safety deposit box on that same day. Appellant arguably accessed the safety deposit box at 10:30 on the morning that Fischer was killed.[4]

Other evidence showed that Heriberto Pizaña, one of the alleged killers, obtained a room for two at the La Quinta Inn in Brownsville on March 2, 1993 and departed on March 4, 1993. Another room at the motel was registered to Garza, who arrived on March 1, 1993 and left on March 11, 1993. Telephone records indicate phone calls to the same Dallas area number were made from Pizaña's and Garza's rooms on the day of Fischer's murder. Pizaña's room call to the number was made at 10:16 a.m. Garza's room call to the number was made at 10:24 a.m. Garza's room records show other calls to this same number at other times during his stay. The Dallas area number, however, was never identified nor was its connection to the murder ever shown. Pizaña listed his vehicle as a white Grand Marquis on the motel's register.

Other evidence shows that Israel Olivarez, the other alleged killer, knew Garza's half-brother, Ramiro Moya. In February 1993, Moya went with Garza and Rudy Cuellar to purchase a .38 Super automatic pistol from a Dallas gun shop. Moya later saw the gun at Garza's San Antonio home. The gun with which Fischer was killed was a .38 Super.

---

4. Because of someone's messy handwriting, it cannot clearly be determined whether appellant accessed the box on March 2 or March 3, the day Fischer died.

After Fischer's murder, Garza reported that the gun was stolen during a burglary from his San Antonio home. The murder weapon was never located.

Investigators traced the business card found at the scene of the murder to Rudy Cuellar. Cuellar and Moya were registered at the Brownsville La Quinta Inn during early February 1993. At trial, Moya testified that he had previously told one of the detectives that Garza gave Pizaña a picture of Fischer, but this testimony was admitted under a limiting instruction that the jury was to use this evidence only against Garza, and not appellant.

In the tape-recorded meeting between Martinez and appellant just before appellant's arrest, appellant expressed her concern about not sending "them" anything because "we don't know what they are up to." During this meeting, appellant also said to Martinez, "And, and, there isn't any evidence that I did anything?" The tape recording shows that appellant knew about "Guero" and made a reference to "El Cortado," but there is no evidence to show who this person was. Accordingly, we find no incriminating evidence regarding Olivarez, except for the facts contained in Garza's not-to-be-considered-against-appellant confession.

Viewed most favorably to the verdict, the evidence shows that appellant got Martinez to seek out someone to kill Fischer and that Martinez turned to Garza to find someone to do the killing. There is sufficient evidence to show that appellant gave envelopes of money, directions, and information to Martinez to pass on to Garza, and that Fischer was killed by gunshots fired from a weapon of the same type as that purchased by Garza. The evidence that was admitted against appellant, however, does not support a finding that appellant either employed Pizaña or Olivarez, or that Pizaña or Olivarez murdered Fischer.

First, with respect to Fischer's murder, the jury was instructed that unless they found that Israel Olivarez or Heriberto Pizaña murdered Joey Fischer, they could not convict appellant. The record clearly shows

that there was simply no evidence admitted against appellant to establish that Olivarez killed Fischer. As to Pizaña, there are some suspicious facts regarding his involvement, but none rise to the level of beyond a reasonable doubt. Circumstantial evidence that might possibly link Pizaña to the offense is: 1) Pizaña registered at the La Quinta Inn just before Fischer's murder and departed immediately thereafter; 2) Pizaña drove, roughly speaking, the type of car Fischer's brother saw leave the scene of the killing; 3) Pizaña and Garza made long distance telephone calls to the same Dallas area number after the killing; 4) Garza told Martinez that he was going to "go pay the guys" who were "in the hotel." Although this evidence places some suspicion on Pizaña, we conclude that a rational jury could not have found from them beyond a reasonable doubt that Pizaña murdered Fischer. We have already said that the evidence does not show that Olivarez killed Fischer.

Secondly, the jury was instructed that unless they found that appellant employed Israel Olivarez or Heirberto Pizaña to murder Fischer, they could not convict appellant of capital murder. Even if we could find that the circumstantial facts established that Pizaña killed Fischer, we find the evidence insufficient to show that appellant herself employed Olivarez and Pizaña to kill Fischer.[5] There is no evidence in the record that appellant ever had any contact with Pizaña, Olivarez or Garza. Appellant's only contact was with Martinez. There is also evidence that appellant gave an envelope of money to Martinez and that she in turn gave it to Garza. The facts show there were several parties to the offense. In order, however, for the jury to find appellant criminally responsible for Pizaña's, Olivarez', Garza's or Martinez' conduct under these facts, the trial court was required to charge the jury on the law of parties. *Jones v. State,* 815 S.W.2d at 670. (charge which fails to apply a theory of law to the facts of the case is insufficient to authorize conviction on that theory, even

**5.** The State does not argue in its brief that the evidence shows that appellant hired Olivarez or Pizaña.

where the theory of law is abstractly defined in the charge).

Chapter 7 of the penal code sets out the circumstances under which one may be held criminally responsible for the conduct of another. Section 7.01(a) provides that "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX.PENAL CODE ANN. 7.01(a) (Vernon's 1994). Section 7.02(a) provides that "A person is criminally responsible for an offense committed by the conduct of another if: (1) ...; (2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense;" TEX.PENAL CODE ANN. 7.02(a)(2) (Vernon 1994.)

The record before us reflects that the State failed to request that the law of parties be included in the application paragraph of the charge and otherwise made no objections to the charge as submitted by the court. Accordingly, the charge, as given, will not support appellant's conviction because the jury was not instructed that appellant could be found guilty if it found, beyond a reasonable doubt, that she, with the requisite intent solicited or directed Martinez to have Fischer murdered by others. And, since the evidence that was to be considered against appellant failed to establish that appellant employed Olivarez or Pizaña, or that Olivarez or Pizaña killed Fischer, we must order appellant's acquittal.

Accordingly, in light of the charge given, we find the evidence insufficient to sustain appellant's conviction. Because the evidence is insufficient, we need not address appellant's other complaints. See TEX.R.APP. P. 90(a). The judgment of the trial court is, therefore, reversed, and appellant is ordered acquitted. See TEX.R.APP. P. 87(b)(3).