**Donald Ray COLEMAN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 12–95–00270–CR.**

Court of Appeals of Texas, Tyler.

Aug. 26, 1997.

Discretionary Review Refused Oct. 29, 1997.

William C. Wright, Tyler, for appellant.

Edward J. Marty, Tyler, for appellant.

Before RAMEY, C.J., and HOLCOMB and HADDEN, JJ.

HOLCOMB, Justice.

Donald Ray Coleman ("Appellant"), was convicted by a jury of capital murder. The State elected not to seek the death penalty, and his punishment was set by the court at life imprisonment. Appellant was convicted under the law of parties pursuant to Chapter 7 of the Texas Penal Code. In his single point of error, Appellant claims the evidence was insufficient to sustain a verdict of guilty for the offense of capital murder. We will affirm.

In the instant case, the standard for review of a sufficiency of the evidence question is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found, beyond a reasonable doubt, the essential elements of the crime, including Appellant being a party to it. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *McDuff v. State*, 939 S.W.2d 607, 614 (Tex.Cr.App.1997); *Shears v. State*, 895 S.W.2d 456, 458 (Tex.App.— Tyler 1995, no pet.). We must consider all of the evidence which the jury was permitted to consider, whether rightly or wrongly,[1] bearing in mind that "[t]he evidence [supporting the verdict] is not rendered insufficient simply because appellant presented a different version of the events." *Anderson v. State*, 701 S.W.2d 868, 872 (Tex.Cr.App.1985). "Although faced with conflicting inferences, a reviewing court must presume that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Turro v. State*, 867 S.W.2d 43, 47 (Tex.Cr.App.1993). The verdict of the jury must be upheld "unless it is found to be irrational or unsupported by more than a 'mere modicum' of the evidence." *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Cr.App.1988).

It being undisputed that Appellant was present at the commission of the offense, he argues that there was insufficient evidence of intent to promote or assist in the murder by soliciting, directing, encouraging, aiding or attempting to aid the party who shot the victim. Appellant cites *Beier v. State*, 687 S.W.2d 2 (Tex.Cr.App.1985), *Cordova v. State*, 698 S.W.2d 107 (Tex.Cr.App.1985), as well as other cases, which correctly set forth the State's burden when seeking to convict someone under the law of parties pursuant to TEX.PEN.CODE ANN. §§ 7.01 and 7.02 (Vernon Supp.1994).[2] The court's charge contained

---

1. *Thomas v. State*, 753 S.W.2d 688, 695 (Tex.Cr.App.1988).

2. Section 7.01 **Parties to Offenses**

   (a) A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.
   (b) Each party to an offense may be charged with commission of the offense.
   (c) All traditional distinctions between accomplices and principals are abolished by this section, and each party to an offense may be charged and convicted without alleging that he acted as a principal or accomplice.

   Section 7.02 **Criminal Responsibility for Conduct of Another**

   (a) A person is criminally responsible for an offense committed by the conduct of another if:
   (1) acting with the kind of culpability required for the offense, he cause or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense;
   (2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or
   (3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to

all the elements and the manner and means which the jury could have considered in reaching its verdict finding Appellant guilty as a principal or as a party. We will address the evidence and give due regard to Appellant's version of events.

On April 19, 1994, a red Ford Probe followed John and Bobbie Luttig to their home, where Mr. Luttig was shot and killed with a .45 caliber semi-automatic handgun. Following the shooting, the perpetrators drove both the Probe and the Luttig's 1987 Mercedes Benz away from the scene. The car jackers abandoned the Mercedes a short distance away with a flat tire and a damaged undercarriage. Several weeks after the incident, Gregg County Crimestoppers received an anonymous tip that Appellant, his older brother, Cedrick Coleman ("Cedrick"), and Napoleon Beazley ("Beazley"), a juvenile, committed the Luttig car jacking/murder.

On the date the police received the information, they interviewed the suspects. Appellant ultimately gave three statements, all of which were introduced into evidence at trial. Appellant gave his first statement that night, the second the next morning, and the last on January 20, 1995, in the presence of his attorney. Appellant's statements were the most probative evidence of his involvement in the crime. Briefly, in the first statement, he denied getting out of the Ford Probe at the Luttig's house. In his second statement, Appellant admitted that he got out of the Probe with an unloaded shotgun. We will not detail the first two statements, but will summarize Appellant's last statement. This attestation gives an overview of the case while casting Appellant's involvement in its best light. The following is Appellant's account of the incident:

In the early afternoon of April 19, 1994, Appellant, Cedrick, and Beazley, in Beazley's mother's red Ford Probe, drove to Corsicana from Grapeland, where they lived. Appellant fell asleep, and when he awoke in Corsicana, he noticed a .45 caliber pistol in the center console. After driving around the mall in Corsicana, someone suggested that they go to the mall in Tyler. As they were leaving Corsicana, Beazley indicated a Lexus which he wanted to "jack." He told Cedrick, who was driving, to follow it. They pursued the Lexus to Tyler, where they lost it at a red light. Beazley became angry at Cedrick for losing track of the car. They proceeded to the Tyler mall, then Beazley suggested they go to a Mexican restaurant.

When they pulled into the restaurant parking lot, Beazley spotted a Mercedes Benz and directed Cedrick to park behind it. A man was walking in the direction of the Mercedes when Beazley got out of the car with the .45 pistol in his hand. The man then turned around and reentered the restaurant. The three young men proceeded to leave town, but Beazley said that he still wanted a car. Cedrick said he would rather go home. Beazley told Cedrick "I guess I'm going to have to shoot me a driver" and told Appellant "I guess I'm going to have to shoot me a punk." At this point, Appellant finally understood that Beazley and Cedrick were talking about stealing a car and that Beazley expected Cedrick to help him.

Beazley got into the driver's seat, and saw a yellow Mercedes pull up to the red light. The Mercedes contained an older man, who was driving, an older woman, and two dogs. Beazley said, "That's the car I'm going to get right there." He told Cedrick to get the gun out of the back of the car. It was at this point that Appellant first learned that another gun was in the car. Cedrick refused to help, so Beazley told Appellant to get the gun. Appellant reached back and got it out of a window blind box. Cedrick told Beazley that they were not going to help him, to which Beazley responded, "You just drive my car home."

Beazley followed the Mercedes into a residential neighborhood, stopped the car around the corner and turned off the lights. Beazley

make a reasonable effort to prevent commission of the offense.
(b) If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed,

though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

then jumped out of the car and ran across a yard toward the house where the Mercedes was idling. He quickly returned, took his shirt off, placed it in the front seat, and said, "It's on." Beazley told Appellant to "come on," then ran across the yard to the bushes bordering the Luttig driveway.

Cedrick told Appellant to get the gun and "go stop the fool." Appellant exited the car with the gun and went to the Luttig driveway. He saw the garage door open, the car drive into the garage, and a light turn on. When he started up the driveway, Beazley jumped from the bushes with the .45 and ran toward the man who had gotten out of the driver's side of the Mercedes. The man started toward Beazley with his hands up in front of his face as if he were trying to protect himself. He was yelling "no!" Beazley grabbed the man and threw him down behind the Mercedes. The man sat facing the inside of the garage, with Beazley standing between him and the Mercedes. Beazley fired a shot at the man, but the man did not fall over. Appellant yelled, "What are you doing? Why are you doing this?" Beazley did not answer him.

Beazley then ran around to the passenger side of the car, where the lady was exiting the Mercedes, and fired one shot at her. She immediately fell to the ground. Appellant believed Beazley had shot the lady. Beazley walked back to the man and shot him two more times. Beazley started searching for the keys and told him "help me, help me." Appellant asked Beazley "What are you doing? What the fuck are you doing?" Beazley asked him if the lady was still alive. Appellant told him she was still moving and Beazley told him to "shoot the bitch." Appellant told him that he wouldn't. But when Beazley starting towards the lady, Appellant told him she wasn't moving anymore.

Beazley finally found the keys to the Mercedes. When Appellant refused to get into the car, Beazley took several steps toward him in a threatening manner. Appellant moved the lady's leg out of the car door and moved her away from the car so she would

not get run over. Beazley saw him moving the lady and told him "fuck that bitch."

Beazley backed the car out of the garage, then ran over bushes trying to get out of the driveway, for which he blamed Appellant. Appellant got out of the car and removed branches from one of the tires and from the front end of the Mercedes. They drove out of the driveway and Appellant told Beazley he wanted to get in the car with Cedrick. Beazley told him that he couldn't, because he wasn't going down by himself. After they had driven a short distance, with Cedrick following in the Ford Probe, they were forced to abandon the Mercedes because of a flat tire and other damage to the car. Beazley complained that Appellant was not helping him, then told him that Appellant didn't have to worry because he didn't do anything and not to tell anyone about the incident. Appellant was afraid of Beazley because he threatened that if anyone said anything, he would kill them and himself before the police could catch him. Appellant returned home some time after midnight. He later told his girlfriend what had happened.

Other evidence introduced at trial included the following:

The lady in the Mercedes, Bobbie Luttig, was not shot by Beazley, but fell down "playing dead." She testified that she did not hear Appellant's protestations or other conversations during the incident. She did hear someone say, "Get rid of the dogs."[3] She further stated that her leg was not caught in the door, that no one moved her, and that someone got into the passenger's seat while the car was still in the garage. She could not identify any perpetrator.

An FBI agent testified that Cedrick and Beazley had been to Corsicana the previous night to steal a vehicle. La Quinta Bailey, Appellant's former girlfriend, admitted that Appellant talked to her that night, that he was nervous, and when he left to go to Corsicana, he knew that Cedrick and Beazley intended to "jack" a car that night.

There was evidence that Appellant had previously sold the shotgun to Beazley for $50.00. Beazley had cut down the stock and

---

**3.** The Luttigs had two dogs which stayed in the     Mercedes throughout the incident.

barrel before the incident. The record further reflected that Cedrick and Beazley had hidden the guns on the afternoon of June 6, 1994, upon learning that authorities were questioning Appellant. Later, Cedrick took law enforcement officers to the exact location where he and Beazley had hidden the Haskel .45 and the .12 gauge sawed-off shotgun. The location of the guns was directly across the street from Beazley's residence.

Appellant relies upon his confessions to show that although he was with Beazley when Beazley murdered John Luttig, and although he was carrying a shotgun at the scene of the murder, he did not encourage, aid, or attempt to aid Beazley in the commission of the robbery of John Luttig nor could he have anticipated that Beazley would murder John Luttig. To reach this conclusion, we would have to ignore the jury's right as previously set forth to believe some, all or none of the evidence. Here they obviously did not totally believe the exculpatory portions of Appellant's statements.

Objectively looking at the evidence in the light most favorable to the verdict, Appellant was with Cedrick and Beazley when they made the trip from Grapeland to Corsicana. The three followed a Lexus from Corsicana to Tyler, while Beazley talked of getting the car. After losing the Lexus, they went to a restaurant where Beazley, with a .45 caliber pistol in hand, got out of the car to confront the owner of a Mercedes Benz. His plan was thwarted only by the owner's decision to return to the restaurant. After Beazley returned to his car, Cedrick drove toward Grapeland. But at Coffee Landing, Beazley began driving and turned back towards Tyler. When they got to the loop they saw John Luttig's yellow Mercedes Benz. While they followed the Luttigs, Beazley announced he was going to get that car. After reaching the Luttigs' home, Beazley armed himself with a .45 caliber pistol and Appellant armed himself with the sawed-off shotgun. Beazley murdered John Luttig and attempted to murder Bobbie Luttig. Beazley, standing in John Luttig's blood, rifled his pockets until he found the car keys. Beazley got in the car to drive away, with Appellant in the passenger seat. Appellant helped Beazley

clear brush from the Mercedes. He stayed with Beazley until they were forced to abandon the Mercedes.

When Appellant first confessed, he avoided mentioning that he was with Beazley in the garage, implying that Beazley was alone when he murdered John Luttig, and that Appellant and his brother had remained in the Ford Probe. The next day, Appellant began the interview with police by saying that he had not been truthful the day before. In his second statement, Appellant admitted the sawed-off shotgun was accessible from the time the three began following the Lexus. He also acknowledged that he had gotten out of the car at the Luttigs' house to see what Beazley was doing. Appellant stated that he was walking towards the garage when the first shot was fired. Seven months later, on January 23, 1995, Appellant signed the written confession discussed above. This later statement, though more detailed, still attempted to move blame from Appellant to Beazley.

In the second and third statements, Appellant admitted knowing about the weapons in the car. In the second statement, he conceded to getting out of the Ford Probe at the Luttigs' house before any shots were fired. In the third statement, he claimed that he only picked up the shotgun when his brother told him to "go stop the fool." Appellant admitted knowing that Cedrick and Beazley were in possession of the shotgun the night before, because Appellant had given it to them.

From the inconsistencies in the three statements, the jury could have rationally believed that Appellant had the requisite intent to aid Beazley. It was rational for a jury to find that when Appellant jumped out of the car with a shotgun in hand, he intended to assist Beazley rob the owners of the Mercedes Benz. It was also reasonable to conclude that because of Beazley's prior acts and words, Appellant should have anticipated that Beazley would murder or attempt to murder the owner of the yellow Mercedes Benz. Although we do not know under which specific subsection the jury found Appellant to be a party to the murder of John Luttig, there was ample evidence that he was

a party under Section 7.02(b). Appellant's point of error is overruled.

The judgment of the trial court is **affirmed**.