Preston TIPPITT a/k/a Preston Tippett, Appellant,

v.

The STATE of Texas, State.

No. 2–99–391–CR.

Court of Appeals of Texas, Fort Worth.

March 15, 2001.

recovery.

Robert Ford, Fort Worth, Attorney for Appellant.

Tim Curry, Crim. District Atty., Charles M. Mallin, Ass't D.A., Chief of Appellate Section, Tanya S. Donhoney, Kevin Rosseau, Sheila B. Wynne, Ass't District Attorneys, Fort Worth, Attorneys for Appellee.

Panel F: CAYCE, C.J., DAY and GARDNER JJ.

## OPINION

GARDNER, Justice.

### I. Introduction

Appellant Preston Tippitt was convicted of capital murder and sentenced to life imprisonment. In one point on appeal, he contends the evidence was legally insufficient to support his conviction as a party to the offense of capital murder. We affirm

the judgment in part, as modified, and reverse and remand in part for a new punishment hearing.

## II. FACTUAL BACKGROUND

Cleo Heath, the victim, lived in Fort Worth with his wife Delisa Miller, her sister Labeedah Dawkins, and his three children. He worked at Goodwill and was also a drug dealer, primarily dealing in marijuana. On the evening of May 14, 1997, Heath and two of his friends, James White and Desmond Williams, drove to the south side of Fort Worth in an attempt to buy some heroin. They went to a house on East Harvey Street, looking for Michael Jerome Hayes. Throughout the day of May 14, 1997, Hayes and Lorenzo McKnight had been drinking beer, smoking marijuana, and using heroin. Hayes and McKnight repeatedly ran into Robert Whitaker and Appellant, who were hanging out at a local gas station with Whitaker's girlfriend, Velisia Wafford, and Chris Jackson. In the late afternoon, Whitaker, Appellant, and Wafford piled into Hayes's car with Hayes and McKnight to go to one of Hayes's several houses on East Harvey and pick up Hayes's sister, identified in the record only as "Puddin'."

About the time that Heath, White, and Williams arrived at the house on East Harvey, Hayes pulled up in his car and sat in the car in front of the house. The two groups of people apparently did not know each other well. While Williams remained in the car,[1] Heath approached Hayes's car and after a short discussion, Heath bought some heroin.

At the time of the drug transaction, Heath apparently wore a lot of expensive looking jewelry and flashed a wad of cash. While sitting in the back of Hayes's car with Appellant, McKnight heard Appellant say to Whitaker that it would "be a lick if we could get him," meaning that Appellant wanted to rob Heath. McKnight asked Appellant not to do it right there because he did not want to be present when it happened.

McKnight testified that he believed that Appellant and Whitaker were acting together in wanting to rob Heath. According to McKnight's testimony at trial, Whitaker was known for "jacking" or robbing people. McKnight further stated that Whitaker and Appellant were always together and that the two were known "as a pair."

During the heroin transaction at the door of Hayes's car, Heath stated that he was in the business of selling marijuana and that Hayes and his friends could come to his house to obtain some "killer weed." Heath told Hayes and the other occupants of his car, including Appellant and Whitaker, where he lived, stating that his house was right behind "Bill Sodds," a business that is somewhat of a landmark in the area. Both Appellant and Whitaker told Heath to remember their faces when they came over later. Heath left, and shortly thereafter, Hayes dropped Appellant and Whitaker off at the same gas station where they had been spending time that day.

At the gas station, Appellant, Whitaker, and another individual identified as Keddreco Davis went across the street and got into a red car driven by Chris Jackson. McKnight testified that he then walked across the street and told Jackson not to take Appellant and Whitaker anywhere because they were "probably going to get in some trouble." McKnight said that Jackson failed to heed his advice and "burn[ed] off" with the group in the red car.

---

1. Williams stated that the guys in that neighborhood were his enemies and he remained in the car because he was not looking for any trouble.

Meanwhile, after making the heroin purchase, Heath, White, and Williams went back to Heath's house. Heath told Williams that the guys they had just met might come over to "score some weed." White went home, but Williams stayed at Heath's house. Williams and Heath both used some of the heroin Heath had purchased. Later in the evening, Delisa Miller and Labeedah Dawkins returned home. Dawkins and Heath's three children went to sleep.

Still later that evening, while watching television in the living room with Heath and Miller, Williams responded to a knock on the door of Heath's home. Appellant and Whitaker were at the door. When Heath saw the visitors, he told Williams that they were okay because they were the guys from whom he had just bought the heroin. Williams went back to the living room sofa, while Heath and Whitaker began to transact business in the kitchen.[2]

Suddenly everything apparently went wrong when Miller heard Heath say, "Oh, no, man," and then she and Williams heard two shots ring out. Williams looked over to see Heath trying to grab a gun. Whitaker shot Heath twice. Wounded, Heath ran toward his children's room, where they were in bed, to try to jump out of the front window, but Whitaker chased Heath down, firing four more shots.

When the shooting began, Appellant and Williams ran for the front door. Miller started to run out the front door also, but she heard the window crash in her children's room and started to run back inside. On his way out of the house after shooting Heath in the children's bedroom, Whitaker stopped to hold his weapon to Miller's head. She recalled pleading for her life

and then watching Whitaker and another person jump into a red car.

After fleeing the scene, Williams returned about five minutes later to find Heath barely alive on the floor of his children's bedroom, being held by Miller. According to the medical examiner, Heath died after suffering four gunshot wounds that lacerated his heart and lungs. Williams later identified Appellant from a photo as Whitaker's companion.

Officers and emergency personnel were dispatched to Heath's home at about 11:35 p.m. Officer P.C. Ray, a crime-scene investigator, saw a bullet hole, splattered blood, a bullet embedded in the kitchen floor, and other damage on the kitchen walls. Blood was sprayed on the hallway wall in an arching pattern, as if an artery had been hit. Officer Ray found that a bedroom window facing out to the front of the house was broken through. Blood was spattered in that room, and there was a large pooling stain on the floor at the foot of the bed along with a crumpled box fan. Bullet holes were also found in the bedroom. No shell casings were found at the scene. Officer Ray stated that the evidence he observed in Heath's home was consistent with someone having been shot in the kitchen, running down the hall trailing blood, and then attempting to jump out of the bedroom window, but, instead, falling on top of a box fan.

During the initial investigation, James White gave the police a description of the white car he had seen earlier that day being driven by Hayes. Shortly thereafter, at the gas station on the south side, officers found a car fitting the description, which was occupied by Hayes and McKnight. Hayes voluntarily spoke with the police, Whitaker was ultimately arrest-

---

2. Williams later said that Appellant went to the kitchen with Whitaker and Heath. Miller said that Appellant sat down on the end of the sofa, right next to her kitchen, and that only Whitaker went into the kitchen with Heath.

ed, and the murder weapon was located in the grass beneath Whitaker and Wafford's apartment window. After police spoke with Wafford, Appellant was identified as the second suspect.

After Detective John Thornton spoke with a relative of Appellant's, he received a phone call from Appellant. Appellant gave a written statement that was introduced as State's Exhibit Number Three. In this statement, Appellant stated that Jackson was the driver and admitted that he was in Heath's house at the time of the offense, but claimed that he intended only to buy marijuana and that he stayed in the living room and never went into the kitchen. Appellant stated that when he heard gun shots, he ran out the front door and got into the front seat of Jackson's car. He heard Whitaker get into the back seat and say "all we got is a sack of weed," and then the group drove back to their side of town. Appellant also stated that he "didn't know that [Whitaker] had a gun." Appellant was not arrested after giving this statement.

However, according to Detective Thornton, he received additional information indicating that Appellant's involvement was more than he had admitted in the written statement and sought another meeting with Appellant, letting Appellant know that he had more information. Appellant then gave a second written statement suggesting a greater degree of his involvement in the crime than his first statement implied. This second statement was introduced as State's Exhibit Number Five.

In this second statement, Appellant admitted that at the gas station after Heath had bought the heroin at Hayes's car, he heard Whitaker and Wafford discuss "hitting a lick," suggesting they wanted to rob Heath. Appellant also recalled that, be-

fore he, Keddreco Davis, and Whitaker got into Jackson's car at the gas station, he heard Whitaker say that they were "fixing to go hit a lick." Appellant also stated that, as he and Whitaker approached Heath's front door, Whitaker stated that "this was the lick right here," suggesting that the robbery was about to occur. Furthermore, in this statement, Appellant stated only that he "didn't see" Whitaker with a gun. Appellant still declared that he remained in the living room during the shooting and that he ran back to Jackson's car when he heard gun shots. Following this statement, Appellant was arrested and charged with capital murder.[3]

Evidence was also presented regarding gang involvement of Appellant, Whitaker, Williams, and McKnight. During trial as the lunch break began, Appellant flashed a gang sign at Williams following Williams's testimony. The sign was purportedly Appellant's way of telling Williams that Appellant had not killed Heath, Williams's "home boy." Williams explained to the jury that he was formerly a Crip gang member. He also explained that Whitaker's nickname, "B.K.," meant "Blood Killer," and that the Bloods were the Crips' opposing gang. McKnight, a member of the "4X3 Gangster Crips" also known as "Four Tres," testified that Appellant was associated with a person named "B.K.," although Appellant and B.K. were not in McKnight's "set."

After hearing the evidence, the jury began their deliberations. The jury requested to have McKnight's testimony read to them. Their request focused on Appellant's statement to Whitaker that "it would be a lick if we could get him," referring to robbing Heath. The jury subsequently convicted Appellant of capital murder.

---

3. As a result of the investigation, Velisia Wafford, Robert Whitaker, and Keddreco Davis were also arrested and charged with capital murder.

### III. LEGAL SUFFICIENCY OF THE EVIDENCE

#### A. Standard of Review

 In his sole point on appeal, Appellant complains that legally insufficient evidence supports his conviction for capital murder, specifically contending that the evidence was legally insufficient to support his conviction as a party to the offense of capital murder. In reviewing the legal sufficiency of the evidence to support a conviction, the critical inquiry is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *McDuff v. State,* 939 S.W.2d 607, 614 (Tex.Crim.App.1997). We view the evidence in the light most favorable to the verdict. *Narvaiz v. State,* 840 S.W.2d 415, 423 (Tex.Crim.App.1992). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

 The legal sufficiency of the evidence is a question of law. The issue on appeal is not whether we as a court believe the State's evidence or believe that the defense's evidence outweighs the State's evidence. *Matson v. State,* 819 S.W.2d 839, 846 (Tex.Crim.App.1991); *Wicker v. State,* 667 S.W.2d 137, 143 (Tex.Crim.App. 1984). Our duty is not to reweigh the evidence from reading a cold record but to act as a due process safeguard ensuring only the rationality of the fact finder. *Williams v. State,* 937 S.W.2d 479, 483 (Tex.Crim.App.1996). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson,* 819 S.W.2d at 846. The standard for review is the same for direct and circumstantial evidence cases. *Kutzner v. State,* 994 S.W.2d 180, 184 (Tex. Crim.App.1999).

#### B. Capital Murder and the Law of Parties

Under section 19.03(a)(2) of the Texas Penal Code, a person commits capital murder if he intentionally or knowingly commits murder as defined under section 19.02(b)(1) "in the course of committing or attempting to commit ... robbery." TEX.PENAL CODE ANN. § 19.03(a)(2) (Vernon 1994). A person commits murder under section 19.02(b)(1) if he intentionally or knowingly causes the death of an individual. TEX.PENAL CODE ANN. § 19.02(b)(1).

Under the law of parties, a person may be convicted as a party to an offense if the offense is committed by his own conduct or by the conduct of another for which he is criminally responsible. *Id.* § 7.01(a). Section 7.02(a)(2) of the Texas Penal Code provides that a person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2).

 Because Appellant raises his sufficiency claim in the context of an offender convicted as a party, the evidence will be held sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement. *Ransom v. State,* 920 S.W.2d 288, 302 (Tex.Crim.App. 1994) (op. on reh'g); *Cordova v. State,* 698 S.W.2d 107, 111 (Tex.Crim.App.1985). "In determining whether the accused participated as a party, the court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Cordova,*

698 S.W.2d at 111. Circumstantial evidence may be used to prove party status. *Id.*

Further, section 7.02(b) provides if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. TEX.PENAL CODE ANN. § 7.02(b). The term "conspiracy" is defined as an agreement between two or more persons, with intent that a felony be committed, that they, or one or more of them, engage in conduct that would constitute the offense. *Id.* § 15.02(a). An agreement constituting a conspiracy may be inferred from acts of the parties. *Id.* § 15.02(b).

 It is well-settled that the law of parties may be applied to a capital murder case though not alleged against the defendant in the indictment. *Wood v. State,* 4 S.W.3d 85, 89 (Tex.App.—Fort Worth 1999, pet. ref'd). Moreover, a defendant in a capital murder case may be convicted solely on a conspiracy theory of culpability contained in the jury charge. *Fuller v. State,* 827 S.W.2d 919, 932–33 (Tex.Crim.App.1992).

### C. Application

 At the conclusion of the guilt-innocence stage, the jury was authorized by the trial court's charge to convict Appellant as a primary actor to capital murder or, alternatively, as a *party* to capital murder under the provisions of sections 7.02(a)(2) or 7.02(b). *See Holiday v. State,* 14 S.W.3d 784, 789 (Tex.App.—Houston [14th Dist.] 2000, pet. ref'd), *petition for cert. filed,* (U.S. Oct. 24, 2000) (No. 00–

8255). The jury returned a general verdict, finding Appellant guilty of capital murder. When a jury returns a general verdict and the evidence is sufficient to support a guilty finding under any of the allegations submitted, the verdict will be upheld. *Rabbani v. State,* 847 S.W.2d 555, 558 (Tex.Crim.App.1992). Therefore, we apply the legal sufficiency standard of review to each theory of the offense as submitted to the jury in the court's charge. *Id.*

Because the evidence clearly established that Whitaker, not Appellant, was the shooter, Appellant could not have intentionally caused the death of Heath by shooting him with a deadly weapon, and the evidence was, accordingly, legally insufficient to support Appellant's conviction as a primary actor. *See, e.g., Cisneros v. State,* 915 S.W.2d 217, 222 (Tex.App.—Corpus Christi), *pet. ref'd,* 935 S.W.2d 789 (Tex.Crim.App.1996). Therefore, in finding Appellant guilty of capital murder, the jury necessarily concluded either that Appellant, during the course of robbing Heath, intentionally promoted or assisted in the commission of Heath's murder or, alternatively, that in facilitating a conspiracy to commit robbery, Appellant should have anticipated the act that resulted in Heath's murder. *See* TEX.PENAL CODE ANN. § 7.02(a)(2), (b).

After examining the evidence in this case to determine if there is legally sufficient evidence to convict Appellant as a party to capital murder, either by promoting or assisting Whitaker in the commission of the offense or by conspiring with Whitaker to commit robbery and anticipating Whitaker's conduct as a result of carrying out the agreement, we hold that the evidence was legally insufficient to support a finding under either theory of criminal responsibility.

First, we believe that the evidence is insufficient to establish Appellant's encouragement, promotion, or assistance in Whitaker's commission of capital murder. *See id.* § 7.02(a)(2). Appellant cannot be found guilty as a party to capital murder under section 7.02(a)(2) without legally sufficient evidence that he was "acting with intent to promote or assist the commission of" an intentional murder. *Martinez v. State,* 763 S.W.2d 413, 425 n. 5 (Tex.Crim. App.1988). Appellant's vicarious liability under 7.02(a)(2) extends no further than that which he specifically intended to promote in aiding or attempting to aid Whitaker—a robbery. *Id.*

We recognize that an appellant's presence at the commission of an offense, coupled with proof of a prior agreement that the offense be committed, would serve to establish both encouragement of and intent to promote the commission of that offense and, hence, would render an appellant susceptible to a finding of criminal responsibility under section 7.02(a)(2). *Mayfield v. State,* 716 S.W.2d 509, 514 (Tex.Crim.App.1986). However, here, the evidence of a prior agreement viewed in the light most favorable to the verdict only established a plan to *rob* Heath and not to *murder* him.

Although the direct testimony of the two witnesses from the scene of the murder placed Appellant in or near the kitchen with Whitaker, the shooter, and Heath, the evidence only showed that Appellant and Whitaker originally planned to *rob* Heath. Testimony from McKnight indicated that the *robbery* was actually Appellant's idea and that Appellant had to be persuaded to refrain from *robbing* Heath while they sat in Hayes's car. There was no evidence presented regarding either Whitaker's or Appellant's intent to *murder* Heath. Appellant's presence at the scene of the murder and proof of a plan between him and Whitaker to *rob* Heath is insufficient to show Appellant's encouragement of and intent to commit the offense of *capital murder* under the theory of criminal responsibility set forth in section 7.02(a)(2) but would only be sufficient to show Appellant's encouragement of and intent to promote the offense of robbery or, perhaps, aggravated robbery under the law of parties. Tex.Penal Code Ann. § 7.02(a)(2); *see Martinez,* 763 S.W.2d at 425 n. 5.

Secondly, although the evidence establishes that Heath's murder was committed in furtherance of the robbery, we believe that the evidence fails to support a finding that murder as defined by section 19.02(b)(1) was an offense that Appellant should have anticipated as a result of carrying out the robbery. *See* Tex.Penal Code Ann. § 7.02(b). In virtually all of the Texas cases we have found in which an appellate court has found legally or factually sufficient evidence to uphold a capital murder conviction under the theory of criminal responsibility contained in section 7.02(b), there has been evidence that the appellant was on notice that murder was a possible result of the carrying out of a conspiracy to commit another felony. *See, e.g., Fuller,* 827 S.W.2d at 932 (holding murder should have been anticipated as a possible result of robbery where, although appellant denied participating in any brutality against decedent, appellant admitted having a pocketknife with him at the time of entry and that one of his cohorts usually would have had a knife in that situation); *Green v. State,* 682 S.W.2d 271, 285–86 (Tex.Crim.App.1984) (holding murder should have been anticipated as a possible result of robbery where appellant admitted entering the house armed with a gun); *Simmons v. State,* 594 S.W.2d 760, 764 (Tex.Crim.App.1980) (holding evidence sufficient to support finding that murder should have been anticipated as a result of

robbery where testimony showed, at time of agreement to commit robbery, appellant stated he was going to beat victim, co-defendant pulled out knife and said he was going to stab victim, and appellant said he was going to put victim in graveyard), *judgm't vacated on other grounds,* 453 U.S. 902, 101 S.Ct. 3134, 69 L.Ed.2d 988 (1981); *Ruiz v. State,* 579 S.W.2d 206, 209 (Tex.Crim.App. [Panel Op.] 1979) (holding direct evidence of appellant's participation in aggravated robbery in concert with other individuals while brandishing a deadly weapon would permit any jury to infer that murder should have been anticipated as a result); *Williams v. State,* 974 S.W.2d 324, 330 (Tex.App.—San Antonio 1998, pet. ref'd) (holding evidence sufficient that murder committed in the course of pawn shop robbery was foreseeable to appellant where evidence showed at least one of the five conspirators arrived at the scene armed with a gun, there was testimony by accomplice witness that four of the five conspirators left her apartment with weapons, and there was evidence that bullets or casings from two different guns were recovered from the scene); *Coleman v. State,* 956 S.W.2d 98, 102 (Tex.App.—Tyler 1997, pet. ref'd) (holding evidence sufficient to support finding that appellant should have anticipated murder as a result of conspiracy to commit carjacking where evidence showed that, just prior to subject offense, confederate unsuccessfully tried to carjack another vehicle in appellant's presence by wielding a .45 caliber pistol, confederate announced he was going to get the victim's car, and after following victim home, confederate armed himself with .45 caliber pistol, appellant armed himself with sawed-off shotgun, appellant admitted having knowledge of weapons in car, and appellant admitted supplying the shotgun); *Queen v. State,* 940 S.W.2d 781, 788 (Tex. App.—Austin 1997, pet. ref'd) (holding murder should have been anticipated as a possible result of robbery where evidence showed appellant knew that cohort was member of violent street gang and had reputation for violence in community, appellant had "hung out" with violent cohort on numerous occasions for two months before murder, appellant admitted striking brain-damaged victim and searching his pockets, and appellant conceded that cohorts continued to beat victim when he left victim's apartment); *Alvarado v. State,* 816 S.W.2d 792, 796 (Tex.App.—Corpus Christi 1991) (finding appellant should have anticipated murder would occur as a result of burglary where appellant instigated burglary conspiracy, chose victim's house, stated that victims would have to be beat up or killed, and directed cohorts to kill victims while watching), *aff'd as modified,* 840 S.W.2d 442 (Tex.Crim.App.1992); *Naranjo v. State,* 745 S.W.2d 430, 433–34 (Tex.App.—Houston [14th Dist.] 1988, no pet.) (holding murder should have been anticipated as a possible result of robbery where evidence showed appellant was aware cohorts were armed, appellant exhibited prior understanding that aggravated robbery would occur, and appellant returned to the scene of offense to retrieve victim's wallet while victim still lay on floor dying); *Flores v. State,* 681 S.W.2d 94, 96 (Tex.App.—Houston [14th Dist.] 1984) (holding murder should have been anticipated as a possible result of burglary where appellant knew companion had a gun), *aff'd,* 690 S.W.2d 281 (Tex.Crim.App. 1985). Here, the evidence does not rise to the same level as in those cases where the appellate courts have held that murder should have been anticipated as a result of carrying out the object offense. While there was some evidence in our record that, by his reputation, Whitaker might be prone to commit violence, there was no evidence to establish Appellant's knowledge of Whitaker's violent propensities. Moreover, there is no evidence to show

that Appellant knew Whitaker had a gun when he entered Heath's home. Without such evidence, we cannot hold that the evidence showed, beyond a reasonable doubt, that Appellant should have anticipated intentional murder as a possible result of their agreement to rob Heath.

After a careful review of the record, we believe that, while the evidence fairly establishes that all of the participants had reputations for selling drugs, carrying guns, robbing, and stealing, it does not establish that any participant was a murderer or was inclined to commit murder at the time of the offense.

Furthermore, the record before us shows that, if there was any agreement between Whitaker and Appellant, it was to "hit a lick" on Heath. Appellant concedes in his brief that he was aware of Whitaker's "bad intentions" to "hit a lick." The only testimony explaining the meaning of "jacking" and "hitting a lick" came from McKnight, who characterized both terms as being synonymous with "robbery." This evidence only supports a finding that Appellant was aware of Whitaker's bad intentions to commit robbery. It does not show that Appellant had reason to know that Whitaker would kill Heath during the robbery.

We do not believe robbery is an offense of such a violent nature that murder should always be anticipated as a potential result of its commission, and we have found no case that suggests otherwise. The State urges that Appellant's knowledge that Whitaker had a gun was other evidence that Appellant had actual notice that murder was a possible result of the planned robbery. However, Appellant's two written statements suggest he had no knowledge of Whitaker carrying a gun into the Heath residence. In Appellant's first statement, he contended that he had no knowledge that there was going to be a

robbery or that Whitaker had a gun. In his second statement, however, Appellant stated that he not only heard Whitaker state his desire to commit a robbery after Heath purchased the heroin early in the day, but that Whitaker told Appellant before they entered Heath's house that evening that "this was the lick right here," meaning that they were about to commit robbery. Furthermore, Appellant's second statement only stated that Appellant "didn't see a gun" on Whitaker.

Inconsistencies in these statements were factors that could have been considered by the jury in determining his guilt. *See Coleman,* 956 S.W.2d at 102–03. However, based on these inconsistencies, considering them in the light most favorable to the verdict, we do not believe that the jury could have rationally reached the conclusion beyond a reasonable doubt that Appellant should have anticipated that Whitaker would intentionally or knowingly murder Heath during the course of the robbery. *See id.* Speculation would be required for the jury to infer from the differences in these two statements that Appellant knew or should have anticipated that an intentional murder would be committed by Whitaker. A jury may not resort to speculation to reach a verdict. *Reese v. State,* 653 S.W.2d 550, 553 (Tex. App.—Beaumont 1983, no pet.). Furthermore, even if the inconsistencies in these statements caused the jury to doubt Appellant's credibility, this skepticism does not provide *any* direct or circumstantial evidence that Appellant should have anticipated that Whitaker would commit intentional murder during the robbery. *See Johnson v. State,* 673 S.W.2d 190, 196 (Tex.Crim.App.1984).

We must also note the evidence that Appellant and Whitaker left the scene together in a car driven by Jackson. From this evidence, the jury could have rational-

ly inferred that Appellant acquiesced in the actions taken in furtherance of the robbery, either before, during, or after its commission. *See Crutcher v. State,* 969 S.W.2d 543, 546–47 (Tex.App.—Texarkana 1998, pet. ref'd) (upholding jury's affirmative deadly weapon finding because appellant's continuing active participation in the commission of aggravated robbery constituted acceptance of accomplice's act in its entirety, including knowledge of the use of deadly weapon). However, this evidence, standing alone, would not permit a rational inference that Appellant was criminally responsible for the murder of Heath. *See Scott v. State,* 946 S.W.2d 166, 168 (Tex. App.—Austin 1997, pet. ref'd) (citing *Valdez v. State,* 623 S.W.2d 317, 321 (Tex. Crim.App.1979) (holding that, standing alone, proof that an accused assisted the primary actor in making his getaway is likewise insufficient-even though the accused's conduct may constitute the independent offense of hindering apprehension or prosecution under section 38.05 of the Texas Penal Code) and *Guillory v. State,* 877 S.W.2d 71, 74 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd) (holding that if the evidence shows the mere presence of an accused at the scene of an offense, or even his flight from the scene, without more, then it is insufficient to sustain a conviction as a party to the offense)). Even when this evidence is viewed along with all of the other evidence in the record before us in the light most favorable to the verdict, it would not support a rational inference beyond a reasonable doubt that Appellant should have anticipated murder as a result of his agreement with Whitaker to commit robbery. Once again, we recognize that the jury was entitled to believe or disbelieve McKnight's testimony, but his testimony, even if believed, does not provide any affirmative evidence, direct or circumstantial, that Appellant should have anticipated that murder was a possible

result of the agreement to rob Heath. *See Johnson,* 673 S.W.2d at 196.

 Furthermore, the circumstances surrounding the offense do not show that Appellant should have anticipated intentional murder as a possible result of the robbery. The State asks us to infer that because Whitaker, who was known for committing robbery, and Appellant had planned to rob Heath, a drug dealer, in Heath's own home after Heath had been seen with associates described as "enemies" by Williams, that Appellant was somehow imputed with knowledge that Whitaker intended to use a gun during the commission of the offense and, therefore, Appellant should have anticipated intentional murder as a possible consequence. We reject this contention because it would require us to stack an inference upon an inference. When conducting a legal sufficiency review, a vital fact may not be established by stacking inference upon inference. *See, e.g., Huntley v. State,* 4 S.W.3d 813, 817 (Tex.App.—Houston [1st Dist.] 1999, pet. ref'd). We believe that, under the highly circumstantial nature of the evidence, it would have been irrational for the jury to infer beyond a reasonable doubt that Appellant should have anticipated that Whitaker would commit an intentional or knowing murder in the course of the robbery.

 We fully appreciate that the fact-finder's determination of Appellant's guilt beyond a reasonable doubt cannot be overturned unless it is found to be irrational and that, when we are faced with a record that supports conflicting inferences, we must presume that the trier of fact resolved such conflicts in favor of the prosecution and must defer to that resolution. *Matson,* 819 S.W.2d at 846; *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App. 1988). Although we have separately ad-

dressed much of the evidence in the record, we do not solely consider any of it in isolation, as we recognize our duty to consider *all* the evidence admitted at trial before deciding whether there was sufficient evidence to prove the element of the offense in dispute. *Villalon v. State*, 791 S.W.2d 130, 132 (Tex.Crim.App.1990). Furthermore, we do not sit as a thirteenth juror in assessing the evidence under our legal sufficiency analysis. *See Moreno*, 755 S.W.2d at 867. Be that as it may, the tenuous and highly circumstantial nature of the evidence regarding the element that Appellant should have anticipated intentional murder as a result of carrying out the robbery conspiracy[4] fails to even raise conflicting inferences that would create a presumption in the State's favor as to whether Appellant should have anticipated intentional murder as a possible result of his agreement to aid Whitaker in Heath's robbery.

In summary, viewing all of the evidence in the light most favorable to the State and giving full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts, we hold that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 318–19, 99 S.Ct. at 2788–89; *Santellan v. State*, 939 S.W.2d 155, 160 (Tex.Crim. App.1997). The record establishes, at best, only a "mere modicum" of evidence of Appellant's guilt, which will not rationally support a conviction beyond a reasonable doubt. *See McGinn v. State*, 961 S.W.2d 161, 168 (Tex.Crim.App.1998) (citing *Jackson*, 443 U.S. at 320, 99 S.Ct. at 2789). The evidence, as a whole, was legally insufficient for a rational trier of fact to find that Appellant was a party to capital murder beyond a reasonable doubt. *See, e.g., Navarro v. State*, 776 S.W.2d 710, 712 (Tex.App.—Corpus Christi 1989, pet. ref'd). We sustain Appellant's sole point.

## IV. MODIFYING THE TRIAL COURT'S JUDGMENT

■ We may modify a judgment of conviction to reflect conviction of a lesser included offense only if (1) the court finds that the evidence is insufficient to support conviction of the charged offense but sufficient to support conviction of the lesser included offense and (2) either the jury was instructed on the lesser included offense (at the request of a party or by the trial court sua sponte) or one of the parties asked for but was denied such an instruction. *Collier v. State*, 999 S.W.2d 779, 782 (Tex.Crim.App.1999) (citing *United States v. Vasquez–Chan*, 978 F.2d 546, 552 (9th Cir.1992)).

■ Here, the jury was instructed on the lesser included offenses of robbery and aggravated robbery[5] and was authorized by the court's charge to find Appellant guilty as a party to the offense of robbery or aggravated robbery by using or exhibit-

---

4. *See Queen*, 940 S.W.2d at 787 (noting that under section 7.02(b), the State was required to prove the element of anticipation of murder beyond a reasonable doubt).

5. Under section 29.03 of the Texas Penal Code, a person commits aggravated robbery if he commits robbery as defined in section 29.02 and he (1) causes serious bodily injury to another or (2) uses or exhibits a deadly weapon. Tex.Penal Code Ann. § 29.03(a). A person commits "robbery" under section 29.02 of the Penal Code if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another or threatens or places another in fear of imminent bodily injury or death. *Id.* § 29.02(a). "Theft" is defined as the unlawful appropriation of property with the intent to deprive the owner of the property. *Id.* § 31.03(a) (Vernon Supp.2001).

ing a deadly weapon[6] during the course of the robbery under either section 7.02(a)(2) by promoting or assisting Whitaker in the commission of aggravated robbery or under section 7.02(b) in that aggravated robbery should have been anticipated as a result of the conspiracy to commit robbery.

Although we have held the evidence legally insufficient to support Appellant's conviction as a party to capital murder, we hold that it is legally sufficient to support his conviction as a party to aggravated robbery under the theory of criminal responsibility set forth in section 7.02(b). *See* Tex.Penal Code Ann. § 7.02(b). While the evidence does not support a rational inference beyond a reasonable doubt that Appellant should have anticipated Whitaker would commit an intentional and knowing murder during the course of the robbery, we believe the evidence does support a rational inference beyond a reasonable doubt that Appellant should have anticipated that Whitaker would exhibit a deadly weapon during the course of the robbery. By finding Appellant guilty of capital murder, the trial court necessarily found Appellant guilty of robbery, and Appellant does not challenge the sufficiency of the evidence to support this element of his capital murder conviction. The conspiracy to commit robbery, when viewed in conjunction with the evidence regarding the circumstances of the offense, the offenders, and how they spent their time that day, supports a rational inference beyond a reasonable doubt that Appellant should have anticipated Whitaker would exhibit a deadly weapon during the course of carrying out their conspiracy to commit robbery.

As previously stated, the evidence fairly established that all of the participants had reputations for selling drugs, carrying guns, robbing, and stealing. Detective Thornton testified that Jackson ultimately admitted to providing the murder weapon. Additionally, McKnight's testimony clearly established that Whitaker and Wafford were "into" selling drugs and robbing people, and that Appellant was "tagging along with them all the time." McKnight also testified that, although he saw no weapons on the date of the offense, he knew that Whitaker and Wafford carried guns and that Whitaker's "hustle" was "jacking." Viewed in the light most favorable to the prosecution, we believe this evidence supported a rational inference beyond a reasonable doubt that Appellant should have anticipated that Whitaker would exhibit a deadly weapon during the course of carrying out their conspiracy to commit robbery.

Because we hold that the evidence was legally insufficient to support Appellant's conviction for capital murder but legally sufficient to support Appellant's conviction for the lesser included offense of aggravated robbery and because the jury was authorized by the court's charge to convict Appellant for the lesser included offense of aggravated robbery, we modify the judgment to reflect conviction only for the lesser included offense of aggravated robbery.

## IV. Conclusion

We affirm the trial court's judgment in part, as modified, and reverse and remand in part to the trial court for a new punishment hearing. Tex.R.App.P. 43.2(b), (d).

---

6. The jury was *not* instructed on the alternate method of proving aggravated robbery, *i.e.,* "[causing] bodily injury to another" during the course of a robbery, and was, therefore, not authorized to convict on this theory under the law of parties. Tex.Penal Code Ann. § 29.02(a)(1).