COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-02-278-CR
 
  
WILLIAM MATTHEW SCHIFFERT                                             APPELLANT
A/K/A JERRY SCHIFFERT
  
V.
  
THE STATE OF TEXAS                                                                  STATE
 
 
------------
 
FROM CRIMINAL DISTRICT COURT 
NO. 1 OF TARRANT COUNTY
 
------------
 
OPINION ON REHEARING
 
------------
 
        The 
State has filed a motion for rehearing regarding our original opinion and 
judgment. We withdraw our opinion and judgment of August 12, 2004 and substitute 
the following. We overrule the motion for rehearing.
I. INTRODUCTION
        A 
jury convicted Appellant William Matthew Schiffert as a party of the 
first-degree felony offense of murder, found the habitual offender allegations 
true, and assessed Appellant’s punishment at seventy-five years’ confinement 
in the Institutional Division of the Texas Department of Criminal Justice. See 
Tex. Penal Code Ann. § 19.02(b), 
(c) (Vernon 2003), § 12.42 (Vernon Supp. 2004-05). The trial court sentenced 
Appellant accordingly. On appeal, Appellant raises four points: (1) the trial 
court egregiously erred in the parties application paragraph of the jury charge 
by failing to require the State to prove intent; (2) the evidence is factually 
and legally insufficient; (3) trial counsel was ineffective; and (4) the trial 
court erred in the self-defense portion of the jury charge. We will reverse and 
remand.
II. LEGAL SUFFICIENCY
A. Standard of Review
        In 
his second point, Appellant claims that the evidence presented at trial is 
legally and factually insufficient to support his conviction. The jury was 
authorized by the trial court’s charge to convict Appellant of murder as 
either a primary actor or as a party. See id. §§ 7.01, 7.02. The 
jury returned a general verdict, finding Appellant guilty of murder. See id. 
§ 19.02.
        In 
reviewing the legal sufficiency of the evidence to support a conviction, we view 
all the evidence in the light most favorable to the verdict in order to 
determine whether any rational trier of fact could have found the essential 
elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 
U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Burden v. State, 55 S.W.3d 
608, 612 (Tex. Crim. App. 2001). This standard gives full play to the 
responsibility of the trier of fact to resolve conflicts in the testimony, to 
weigh the evidence, and to draw reasonable inferences from basic facts to 
ultimate facts. Jackson, 443 U.S. at 319, 99 S. Ct. at 2789. When 
performing a legal sufficiency review, we may not sit as a thirteenth juror, 
re-evaluating the weight and credibility of the evidence and, thus, substituting 
our judgment for that of the fact finder. Dewberry v. State, 4 S.W.3d 
735, 740 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).
        When 
a jury returns a general verdict and the evidence is sufficient to support a 
guilty finding under any of the allegations submitted, the verdict will be 
upheld. Swearingen v. State, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003); Tippitt 
v. State, 41 S.W.3d 316, 323 (Tex. App.—Fort Worth 2001, no pet.). Thus, 
we apply the legal sufficiency standard of review to each theory submitted to 
the jury in the court’s charge. Rabbani v. State, 847 S.W.2d 555, 558 
(Tex. Crim. App. 1992), cert. denied, 509 U.S. 926 (1993); Tippitt, 
41 S.W.3d at 323.
B. Evidence at Trial
        The 
evidence presented at trial indicated that Brandy Upchurch began dating the 
victim, Corey McMillan, in 1999. Soon after, they began living together and 
eventually moved into the Budget Inn motel. According to a statement that 
Appellant gave to the police, Appellant first met Brandy Upchurch when he went 
to the motel to visit a friend. Upchurch told Appellant that she couldn’t come 
outside because her “old man [McMillan] would beat her.” Appellant continued 
to talk to Upchurch whenever he went to the motel.
        Ultimately, 
Upchurch left McMillan and moved into Appellant’s trailer. About a month 
later, Appellant arrived at the trailer and found Upchurch gone.  According 
to Upchurch, McMillan had found her in Appellant’s trailer, and after he 
threatened her, she went back with him to the motel. The following day, November 
5, 2001, Upchurch called Appellant to come get her; she told him that she had 
been kidnapped by McMillan and that she wanted Appellant to come pick her up. 
Appellant and his nephew, Aaron Kennedy, went to the motel to get her.
        In 
the meantime, after a confrontation with McMillan, Upchurch left the motel on 
foot. She was picked up by Appellant and Kennedy in a restaurant parking lot. 
The three of them went back to the motel to get Upchurch’s clothes. When 
Appellant, Kennedy, and Upchurch arrived at the motel, Appellant drove the truck 
near the motel doors, so that Kennedy could jump out and grab Upchurch’s 
belongings, which were in a neighbor’s room.
        GinnyLu 
Ward was in the parking lot of Enterprise Rent-A-Car, which shares the lot with 
the motel, when the events transpired. According to Ward, when Appellant drove 
into the motel parking lot, he “acted like [he] didn’t see who [he was] 
looking for, and [then he] made a U-turn.” Upchurch testified that Appellant 
stopped the car and called McMillan on the phone and said, “I’m looking at 
your punk bitch now.” However, the car kept rolling and almost hit a fire 
hydrant; Appellant swung the car around and hit a truck. Soon afterwards, 
McMillan came out into the parking lot. According to Ward, “[the driver] saw 
who [he was] looking for and [he] gunned it, and when he gunned it, he lost 
control for just a moment and hit [a] red truck.”
        Appellant 
then came back around to the motel doors, and Kennedy jumped out of the car and 
began stabbing McMillan. Ward testified that, as Kennedy stabbed McMillan, 
McMillan said, “[W]hat the hell are you doing?” and “[W]hy are you 
here?” According to Ward, Appellant was the driver of the vehicle, and he 
parked it twelve to fifteen inches behind McMillan’s car, so that McMillan’s 
car could not have been backed out without running into Appellant’s car. While 
Kennedy was stabbing McMillan, Ward said that Appellant turned to her and 
“smirked.” After a short time, Kennedy got back in the car, and Appellant 
quickly drove away. As the car left the lot, Upchurch looked back; she saw 
McMillan‘s hand over his throat and blood on his shirt.
        Officer 
Michael McGuire was dispatched to the motel, where he found McMillan, who was 
bleeding and appeared to have been stabbed in the left side of his neck and on 
the left side of his chest. McMillan was taken to the hospital, where he 
subsequently died. Detective Tim Gilpin was also dispatched to the scene. He 
noticed a red pickup truck in the parking lot; the left bumper area of the truck 
had been struck. Based on information that he received from interviewing 
witnesses at the scene, Gilpin ran a license plate number and found that the 
registered owner of the car was Appellant.
        The 
day after McMillan’s death, Officer Richard Curtis, who was assigned to the 
Crime Scene Search Unit, was dispatched to an apartment complex after a search 
warrant had been obtained for Appellant’s vehicle. The car was found at the 
complex and the police impounded it. While examining the car, Curtis stated that 
he had trouble getting the driver-side door open; the door would open only about 
twelve inches. There was one license plate on the car, but it was not registered 
to the car.
        Upchurch 
said that, in the days following McMillan’s death, she saw Appellant, and he 
and Kennedy were trying to stay separate from each other. She also stated that 
she heard Appellant discuss leaving town because he was on parole and he was 
afraid that the police would be looking for him.
        On 
November 9, 2001, Officer Benjamin Jones was on patrol when he saw a car with a 
brake light out. He pulled over the car and asked for identification, but the 
driver had none. The driver gave his name as “Michael Smith.” Officer 
Kenneth Stack arrived on the scene after Jones had pulled over the car. Based on 
a photo that he had seen earlier that day, Stack recognized Appellant as the 
driver. According to Stack, when he showed the photo to Appellant, Appellant 
said, “You got me.”
        According 
to Deputy Medical Examiner Daniel Konzelmann, McMillan’s body had two distinct 
stab wounds, one on the chest and one on the neck. The neck wound was not lethal 
because it did not cross any vital structures. The wound to the chest was lethal 
because it went into the heart. Konzelmann saw no defensive wounds on 
McMillan’s upper arms or hands and no signs indicating a prolonged struggle.
C. Analysis
        The 
evidence clearly established that Aaron Kennedy, not Appellant, stabbed and 
killed Corey McMillan with a knife. Therefore, the evidence was legally 
insufficient to support Appellant’s conviction as a primary actor. See, 
e.g., Tippitt, 41 S.W.3d at 323. Thus, in finding Appellant guilty 
of murder, the jury necessarily concluded that Appellant was guilty as a party.
        The 
Texas penal code states that “[a] person is criminally responsible as a party 
to an offense if the offense is committed by his own conduct, by the conduct of 
another for which he is criminally responsible, or by both.” Tex. Penal Code Ann. § 7.01(a). 
Criminal responsibility is defined several ways, one of which is that the 
defendant, “acting with intent to promote or assist the commission of the 
offense . . . solicits, encourages, directs, aids, or attempts to aid the other 
person to commit the offense.” Id. § 7.02(a)(2).
        The 
abstract portion of the charge submitted to the jury stated the following, in 
relevant part:
  
All persons are parties to an offense who are guilty of acting together in the 
commission of the offense. A person is criminally responsible as a party to an 
offense if the offense is committed by his own conduct, by the conduct of 
another for whom he is criminally responsible, or by both.
  
A person is criminally 
responsible for an offense committed by the conduct of another if, acting with 
intent to promote or assist the commission of the offense, he solicits, 
encourages, directs, aids, or attempts to aid the other person to commit the 
offense. Mere presence alone will not constitute one a party to an offense.
 
 
The application 
portion of the jury charge stated, in relevant part, that the jury was 
authorized to find Appellant guilty of murder if it found that
  
Aaron Kennedy did . . . intentionally with the intent to cause serious bodily 
injury to Corey McMillan, commit an act clearly dangerous to human life, namely, 
to stab him with a knife, which caused the death of an individual, Corey 
McMillan, and you further find that the Defendant, William Matthew Schiffert, 
acted with intent to solicit, encourage, direct, aid, or attempt to aid Aaron 
Kennedy in the commission of the offense . . . .
  
 
The abstract portion of the 
charge correctly stated that criminal responsibility requires both (1) acting 
with intent to promote or assist the commission of the offense and (2) 
soliciting, encouraging, directing, aiding, or attempting to aid the other 
person to commit the offense. See id. However, the application portion of 
the charge erroneously authorized conviction of Appellant as a party if the jury 
found only that he acted with intent to solicit, encourage, direct, aid, or 
attempt to aid Aaron Kennedy in the commission of the offense. In other words, 
the application portion of the charge required neither acting with intent to 
promote or assist the commission of the offense, nor soliciting, encouraging, 
directing, aiding, or attempting to aid Kennedy in the commission of the 
offense. Instead, it required only acting with intent to solicit, encourage, 
direct, aid, or attempting to aid Kennedy in the commission of the offense. This 
is contrary to the elements of the offense, as defined by statute. See id.
        However, 
sufficiency of the evidence should be measured by the elements of the offense as 
defined by the hypothetically correct jury charge for the case. Malik v. 
State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). This hypothetical charge 
accurately sets out the law, is authorized by the indictment, does not 
unnecessarily increase the State’s burden of proof or unnecessarily restrict 
the State’s theories of liability, and adequately describes the particular 
offense for which the defendant was tried. Id.
        The 
hypothetically correct jury charge would have properly authorized the jury to 
convict Appellant if it found that he acted with intent to promote or assist 
Aaron Kennedy in the stabbing death of Corey McMillan, and that he solicited, 
encouraged, directed, aided, or attempted to aid Kennedy in the stabbing death 
of McMillan. Using this approach, we find that the evidence is legally 
sufficient to support Appellant’s conviction.
        Appellant 
was driving the car when he, Kennedy, and Upchurch arrived at the motel. 
According to a witness, Appellant seemed to be looking for someone as he drove 
through the parking lot. Appellant called McMillan from his car and told him, 
“I’m looking at your punk bitch now.” When he saw McMillan, he 
“gunned” the car. Appellant subsequently parked behind McMillan’s car, and 
then Kennedy jumped out of the car and began stabbing McMillan. The jury could 
rationally have inferred that Appellant’s focus was on McMillan, rather than 
getting Upchurch’s belongings, and that Appellant used what Upchurch conceded 
were “fighting words” toward McMillan. Moreover, a rational jury could 
conclude that by parking behind McMillan’s car, Appellant wanted to ensure 
that McMillan did not leave the area.
        Given 
all this evidence, as well as the speed with which Kennedy jumped from 
Appellant’s car and began stabbing McMillan, a rational jury could conclude 
that Appellant acted with the intent to assist Kennedy in the stabbing of 
McMillan, and that he solicited, encouraged, directed, aided, or attempted to 
aid Kennedy in the stabbing of McMillan. Thus, we find that, viewing the 
evidence in the light most favorable to the verdict, a rational jury could have 
found beyond a reasonable doubt that Appellant was guilty of murder as a party. 
The legal-sufficiency portion of Appellant’s second point is overruled.
III. FACTUAL SUFFICIENCY
A. Standard of Review
        In 
reviewing the factual sufficiency of the evidence to support a conviction, we 
are to view all the evidence, both for and against the finding, in a neutral 
light, favoring neither party. See Zuniga v. State, 144 S.W.3d 477, 481 
(Tex. Crim. App. 2004). The only question to be answered in a factual 
sufficiency review is whether, considering the evidence in a neutral light, the 
fact finder was rationally justified in finding guilt beyond a reasonable doubt. 
Id. at 484. There are two ways evidence may be factually insufficient: 
(1) the evidence supporting the verdict or judgment, considered by itself, is 
too weak to support the finding of guilt beyond a reasonable doubt; or (2) when 
there is evidence both supporting and contradicting the verdict or judgment, 
weighing all of the evidence, the contrary evidence is so strong that guilt 
cannot be proven beyond a reasonable doubt. Id. at 484-85. “This 
standard acknowledges that evidence of guilt can ‘preponderate’ in favor of 
conviction but still be insufficient to prove the elements of the crime beyond a 
reasonable doubt.” Id. at 485. Evidence supporting a guilty finding may 
legally support a rational jury’s conclusion, but nevertheless be so weak that 
it does not support the finding of guilt beyond a reasonable doubt. See id. 
In performing a factual sufficiency review, we are to give deference to the fact 
finder’s determinations, including determinations involving the credibility 
and demeanor of witnesses. Id. at 481; Cain v. State, 958 S.W.2d 
404, 407 (Tex. Crim. App. 1997). We may not substitute our judgment for that of 
the fact finder. Zuniga, 144 S.W.3d at 482.
B. Vodochodsky v. State
        Recently, 
the Court of Criminal Appeals held, in a capital murder case, that the evidence 
presented at trial was factually insufficient to support the jury’s verdict 
that the defendant was guilty as a party to the offense. Vodochodsky v. State, 
No. 74129, 2004 WL 840121, at *6-7 (Tex. Crim. App. Apr. 21, 2004). Because that 
case also deals with party liability, a comparison between it and the instant 
case is useful in determining whether the evidence is factually sufficient to 
support Appellant’s liability as a party to an offense.
        In 
that case, the primary actor, Jeremiah Engleton, ambushed and killed two 
sheriff’s deputies and a state trooper before killing himself. Id. at 
*1. The defendant, Engleton’s friend, was tried for and convicted of the 
capital murder of a peace officer who was acting in the lawful discharge of an 
official duty. Id.
        The 
evidence indicated that Engleton, his wife Violet, her sister Sara, and Sara’s 
boyfriend, the defendant, lived together. Id. Following a deputy’s 
response to Engleton’s violent behavior toward his wife one night, Engleton 
said to the defendant, “Do you remember what we’ve been talking about? I’m 
going to do it right now.” Id. at *2. The defendant replied, “No, 
it’s not worth it.” Id. Engleton was subsequently arrested for his 
violent behavior and while in jail, he told one of his cellmates that “[t]hese 
motherfuckers don’t know what they got coming” and that it was going to make 
the front page. Id. While in jail, Engleton called the defendant and told 
him to make sure that Engleton’s wife did not take his semiautomatic assault 
rifle or his semiautomatic pistol. Id. Engleton also told another 
cellmate that he had been arrested for domestic violence and that when he got 
out, he “had plans and planned to make some headlines.” Id. In 
another telephone conversation, Engleton asked the defendant to take care of his 
belongings, and he specifically mentioned the assault rife. Id. Engleton 
also told the defendant to bring $1,000.00 that Engleton had left him, to make 
his bail. Id.
        After 
Engleton was freed on bail, the defendant accompanied Engleton to a gun shop 
where Engleton purchased several boxes of ammunition. Id. When Engleton 
and the defendant arrived home, no one else was there. Id. Sara 
subsequently called the house, and the defendant told her that Engleton had 
left. Id. Sara, Violet, and the defendant’s brother then drove toward 
the residence. Id. When they arrived, they saw Engleton’s vehicle and 
continued on to a grocery store in Pleasanton. Id. Sara then called the 
defendant again. Id. At first, the defendant acted like he was angry 
because they had not shown up, but then he dropped his voice to a whisper and 
told Sara not to come home. Id. Instead, he told her that he would meet 
her at his brother’s house later. Id.
        Subsequently, 
while the defendant was still at the house, a bogus 911 call was placed to the 
County Sheriff’s Office from the house. Id. at *3. Over the next 
several hours, Engleton killed two officers who had been dispatched to his 
residence, took one of the officers’ guns, and wounded several other officers. 
Id. Before he could be taken into custody, he killed himself. Id. 
at *4. Just prior to the killings, a neighbor saw the defendant taking some of 
his belongings from the house to his vehicle. Id. at *3.
        Two 
days later, the defendant talked to a neighbor about the killings, telling him 
that he had bailed Engleton out of jail “[t]o do this.” Id. at *4. 
The defendant also told the neighbor that the night that Engleton was initially 
arrested for assaulting his wife, Engleton wanted to kill the officer who came 
to arrest him, but the defendant told Engleton, “No, . . . we ain’t got 
nothing planned yet.” Id. Finally, the defendant also told his neighbor 
that he knew that Engleton had gone “over the edge” when he took the 
deputy’s gun. Id.
        Although 
the Court of Criminal Appeals concluded that the evidence was legally 
sufficient, it held that it was factually insufficient to support the 
defendant’s conviction as a party. Id. at *5-6. The court noted that 
when Engleton expressed a desire to “do it right now” and the defendant told 
him they did not yet have a plan, neither man specifically mentioned killing a 
peace officer. Id. at *6. Also, when the defendant stated that he bailed 
Engleton out of jail “to do this,” he did not specifically state that he 
bailed him out as part of a plan to kill police officers. Id. Although 
the defendant removed belongings from the house, the court pointed out that 
there was no proof that he did so as part of a murderous plot. Id. 
Finally, the court pointed out the defendant’s comment that Engleton had 
“gone over the edge” when he took the deputy’s gun could just as 
reasonably have been a speculative comment, rather than one indicating that he 
had witnessed the officer’s murder. Id.
        Thus, 
according to the court, none of the evidence presented at trial necessarily 
suggested that the defendant acted with intent to promote or assist Engleton. Id. 
None of his statements directly referred to killing police officers, they were 
devoid of information on the details of the alleged murder plot, and there was 
no other information in the record suggesting that the defendant was planning 
the event with Engleton. Id.
        Also, 
other evidence suggested that the defendant was not working with Engleton. Id. 
His whispered warning to his wife could indicate that while he may have known of 
Engleton’s plan, he was not a party to it. Id. He did not participate 
in the purchase of ammunition, and there was no evidence that the defendant 
actually did any affirmative act to assist Engleton with the plan. Id.
C. Analysis
        As 
in Vodochodsky, all of the evidence in the instant case detailed above, 
that could legally support a rational jury’s conclusion, is nevertheless so 
weak when viewed in a neutral light that our confidence in the verdict is 
undermined. Here, there was no evidence of any kind of conversations or planning 
on the part of Appellant and Kennedy. The witness who saw Kennedy stab McMillan 
stated that she did not know if Appellant said anything to Kennedy just before 
Kennedy got out of the car and began stabbing McMillan. Moreover, there was no 
evidence that Appellant knew that Kennedy intended to stab McMillan or, indeed, 
that Kennedy even had a knife. The testimony of the witness that Appellant 
looked at her during the stabbing indicates that he may not even have been aware 
that Kennedy was stabbing McMillan. Finally, Appellant’s attempts to avoid the 
police do not necessarily suggest that he had acted with intent to promote or 
assist Kennedy. After the stabbing, Appellant expressed fear that the police 
would be looking for him because he was on parole and certainly knew that the 
police would want to speak with him about what happened.
        Thus, 
we conclude that the proof of Appellant’s guilt as a party is too weak to 
support the finding of guilt beyond a reasonable doubt. The factual-sufficiency 
portion of Appellant’s second point is sustained.
IV. CONCLUSION
        Because 
we conclude that the evidence is factually insufficient to support Appellant’s 
conviction, we reverse the judgment of the trial court and remand this cause for 
a new trial. See Zuniga, 144 S.W.3d at 482; Clewis v. State, 922 
S.W.2d 126, 135 (Tex. Crim. App. 1996).[1]
   
   
                                                          ANNE 
GARDNER
                                                          JUSTICE
   
 
PANEL A:   CAYCE, 
C.J.; LIVINGSTON and GARDNER, JJ.
 
PUBLISH
 
DELIVERED: December 23, 2004

 
NOTES
1.  In 
light of our reversal of this cause for factual insufficiency, we find it 
unnecessary to address Appellant’s remaining points.  See Tex. R. App. P. 47.1.