[pic]

 NUMBER 13-10-00086-CR

 COURT OF APPEALS

 THIRTEENTH DISTRICT OF TEXAS

 CORPUS CHRISTI - EDINBURG

HAZAEL GONZALEZ, Appellant,

 v.

THE STATE OF TEXAS, Appellee.

 On appeal from the 139th District Court
 of Hidalgo County, Texas.

 MEMORANDUM OPINION

 Before Justices Rodriguez, Benavides and Perkes
 Memorandum Opinion by Justice Benavides

 A Hidalgo County jury convicted appellant Hazael Gonzalez of the
capital murder of Miguel Cahue, and he was sentenced to life
imprisonment without parole. Gonzalez appeals his conviction raising
five issues: (1) whether the evidence was sufficient to sustain a
capital murder conviction; (2) whether the trial court committed
reversible error for not allowing him to present evidence in support
of an affirmative defense theory of an independent impulse; (3)
whether the trial court committed reversible error for providing
instructions on the law of principals; (4) whether the trial court
committed reversible error when it prohibited Gonzalez’s attorney from
arguing the punishment for a capital murder conviction; and (5)
whether the trial court committed reversible error when it admitted
the victim’s autopsy photos into evidence. We affirm.
 I. Background
 On August 6, 2008, seventy-six-year-old Miguel “Mike” Cahue died
on the floor of his McAllen, Texas trailer home after robbers left him
lying in a pool of his own blood. The State indicted, among others,
then 28-year-old Hazael “Ozzy” Gonzalez for Cahue’s murder and charged
that Gonzalez was responsible for the crime under the law of parties,
even though he did not commit the act that actually killed Cahue. See
Tex. Pen. Code Ann. § 7.02(b) (West 2003); id. § 19.03(a)(2) (West
Supp. 2010). Gonzalez pleaded not guilty to the charges.
 Prosecutors alleged that Gonzalez, who was Cahue’s friend, was
cash-strapped and devised a plan with then fourteen-year-old co-
defendant Wendy Gomez to trick Cahue into letting someone into his
home, then subdue him, tie him up with duct tape, and rob him. Wendy
recruited her teenage brothers, Marvin and Alfredo Gomez, and teenage
friends, Michael Mancha and Jose Martinez, to assist with the crime.
Witnesses testified that Cahue lived alone, was described by friends
and family as healthy and active, and was known to have sexual
encounters with men. Prosecutors alleged that Gonzalez used his
friendship with Cahue and knowledge of Cahue’s sexuality to gain
access to his home by introducing Alfredo to Cahue as a potential
tryst.
 The State presented evidence that on August 6, 2008, Gonzalez
drove Alfredo and Michael to Cahue’s home first, while the other
defendants waited at another location. Gonzalez introduced Alfredo to
Cahue, while Michael hid outside the home and readied to invade
Cahue’s home after Gonzalez left. Gonzalez left Alfredo inside
Cahue’s home, as planned, and drove away to pick up Wendy, Marvin, and
Jesus at an agreed location. Gonzalez then drove back to Cahue’s home
and dropped off the three co-defendants. At this point, Gonzalez
never re-entered Cahue’s home, but instead circled around the
neighborhood in his vehicle and waited for the others to exit the
home. The State presented evidence that Gonzalez’s co-defendants
tackled the victim to the floor to subdue him and proceeded to beat
him with their fists, feet, and a candlestick. The State alleged that
Michael delivered the fatal blows to Cahue’s body, at which point the
group of teenagers moved Cahue’s beaten body to a bathroom floor. The
co-defendants eventually ran out of the victim’s home with various
stolen items, entered Gonzalez’s vehicle, and Gonzalez drove away.
Among the items taken from the home were a digital camera, a jewelry
bracelet, and a paper shredder. Gonzalez never received any of the
stolen property and claims that at all relevant times, he felt
threatened by Wendy and fearful for his life if he did not move
forward with the robbery.
 Gonzalez’s motion for a directed verdict after the State’s case-
in-chief was denied. After a three-day trial, the jury convicted
Gonzalez of capital murder under the law of parties. See Tex. Pen.
Code Ann. §§ 7.02(b), 19.03(a)(2). Because the State did not seek the
death penalty, the trial court automatically sentenced Gonzalez to
life in prison without parole. See id. §12.31(a)(2) (West Supp.
2010). The trial court later denied Gonzalez’s motion for new trial,
and this appeal ensued.
 II. Issue One: Sufficiency of the Evidence
 In his first issue, Gonzalez asserts that there was insufficient
evidence to support his conviction for capital murder.
 A. Standard of Review and Applicable Law
 We must apply the Jackson v. Virginia, 443 U.S. 307, 319 (1979),
standard to determine whether the evidence is sufficient to support
each element of a criminal offense that the State is required to prove
beyond a reasonable doubt. See Brooks v. State, 323 S.W.3d 893, 895
(Tex. Crim. App. 2010) (plurality op.) (holding that the Jackson
standard of review is the “only standard” that should be applied in a
sufficiency review). Under Jackson, this Court must consider the
evidence in the light most favorable to the verdict to determine
whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt. Id. Our analysis
measures the elements of the offense as defined by a hypothetically
correct jury charge. Villarreal v. State, 286 S.W.3d 321, 327 (Tex.
Crim. App. 2009) (citing Malik v. State, 953 S.W.2d 234, 240 (Tex.
Crim. App. 1997)). We must defer to the jury’s determinations of
credibility and weight of the evidence because the jurors are the sole
fact-finders. See Brooks, 323 S.W.3d at 899; see also Tex. Code Crim.
Proc. Ann. art. 38.04 (West 1979) (“The jury, in all cases, is the
exclusive judge of the facts proved, and of the weight to be given to
the testimony. . . .”).
 A person is guilty of capital murder if he intentionally commits
a murder in the course of committing or attempting to commit a
robbery. Tex. Pen. Code Ann. § 19.03(a)(2). The applicable
definition of murder in this case is intentionally or knowingly
causing the death of an individual. See id. § 19.02(b)(1) (West 2003).
 Robbery is classified as a second-degree felony and is defined as
intentionally, knowingly, or recklessly causing bodily injury to
another, or intentionally or knowingly threatening or placing another
in fear of imminent bodily injury or harm while in the course of
committing a theft with the intent to obtain or maintain control of
one’s property. Id. § 29.02 (West 2003).
 In this case, the State charged Gonzalez under what is commonly
referred to as the “law of parties” to hold him responsible for
Cahue’s murder that was allegedly committed by Michael Mancha. See
id. § 7.02(b). One is criminally responsible under the law of parties
if:
 [I]n the attempt to carry out a conspiracy to commit one felony,
 another felony is committed by one of the conspirators, all
 conspirators are guilty of the felony actually committed, though
 having no intent to commit it, if the offense was committed in
 furtherance of the unlawful purpose and was one that should have
 been anticipated as a result of the carrying out of the
 conspiracy.

Id. Additionally, a person commits criminal conspiracy if he has the
intent to commit a felony, agrees with another to engage in conduct
that would constitute the offense, and performs an overt act in
pursuance of that agreement. Id. § 15.02(a) (West 2003).
 Accordingly, a hypothetically correct capital murder jury charge
in this case would state that Gonzalez is guilty if a jury finds
beyond a reasonable doubt that (1) he entered into an agreement with
Wendy Gomez, Marvin Gomez, Alfredo Gomez, Michael Mancha, and/or Jose
Martinez to intentionally, knowingly, or recklessly cause bodily
injury to Cahue or to intentionally or knowingly threaten or place
Cahue in fear of imminent bodily injury or harm while in the course of
committing a theft with the intent to obtain or maintain control of
one’s property; (2) performed an overt act in pursuance of that
robbery; (3) during the attempt to carry out this conspiracy to rob
Cahue, Michael Mancha intentionally murdered Cahue; and (4) this
murder was committed in furtherance of the robbery and was one that
should have been anticipated as a result of carrying out the robbery.

 B. Discussion
 On the first and second elements of the charged offense, the
State introduced into evidence Gonzalez’s “Statement of the Accused,”
in which he voluntarily stated that he “told Wendy that [Cahue] would
be a good target” to rob after they both discussed their mutual
financial troubles. During this discussion, Gonzalez told Wendy of
Cahue’s purported homosexuality, how Cahue allowed strangers into his
home for sexual rendezvous, and described items that were available
for the taking, such as a “real big TV set.” This discussion and
exchange of information formed the basis of the group’s motive,
opportunity, and agreement to rob Cahue. The record also shows that
their plan included subduing Cahue and tying him up with duct tape in
order to take his property. Next, despite Gonzalez’s statements to
police that he did not want to go forward with the robbery and
attempted to avoid fourteen-year-old Wendy after their agreement,
Gonzalez included in his statement that on the afternoon of August 6,
2008, the group (which now encompassed the other co-defendants)
“started going over the plans.” Gonzalez also stated that by that
afternoon, he had called and set up Cahue to meet Wendy’s teenage
brother, Alfredo, who used the fake name “Edward” when introduced to
Cahue for a fake rendezvous. According to his statement, Gonzalez
continued to go along with the plans and drove Alfredo and Michael to
Cahue’s home, while the other co-defendants waited at another
location. After dropping off Alfredo and Michael, Gonzalez returned
to the agreed location to pick up the other defendants and took them
to Cahue’s home, as planned. While Alfredo, Michael, Wendy, Marvin,
and Jose were inside Cahue’s home, Gonzalez circled around the
neighborhood until they came out of Cahue’s house to flee the scene in
Gonzalez’s vehicle. The State elicited testimony from Marvin, who
further corroborated that Gonzalez served as the driver for the co-
defendants. Therefore, we see ample evidence to support the first two
elements of the hypothetically correct charge that Gonzalez (1)
entered into an agreement with at least one co-defendant, Wendy, to
rob the victim through deception and surprise and (2) committed overt
acts in pursuance of the planned robbery, such as setting up the
meeting between Alfredo and Cahue and serving as the group’s driver.
Examined in a light favorable to the verdict, we determine that a
rational juror could find the first two elements of the hypothetically
correct jury charge beyond a reasonable doubt as the evidence is
sufficient to support these findings.
 As to the third element of the offense, if during the attempt to
carry out this conspiracy to rob Cahue, Michael Mancha intentionally
murdered Cahue, the State presented testimony from Marvin, who stated
that by the time he entered the victim’s residence, Michael was on the
floor struggling with Cahue. In order to subdue him, Marvin testified
that Michael punched Cahue’s body with his fists and beat him with a
candlestick holder, all while the victim pleaded with Michael not to
kill him. After the beating, Marvin testified that he, Wendy,
Michael, and Jose moved Cahue’s body into the bathroom where he lied
severely beaten and unable to move. To support Marvin’s statements,
the State presented expert testimony from Hidalgo County Medical
Examiner Norma Farley, M.D., who performed the autopsy on Cahue’s
body. Dr. Farley’s examination showed that the victim had lacerations
around his right eyebrows, which are consistent with a beating from a
punch or a kick. She also testified that Cahue’s skull had
overwhelming hemorrhaging, which again was consistent with blunt force
trauma and likely caused Cahue to lose consciousness. Dr. Farley’s
examination further showed rib fractures on both sides of the victim’s
body and more hemorrhaging in his rib cage, which was further proof of
a physical beating. In her final conclusion, Dr. Farley classified
Cahue’s death as a homicide that was the result of blunt force head
and chest trauma. Reviewed in a light most favorable to the verdict,
we conclude that sufficient evidence was presented to support a
finding of the third element beyond a reasonable doubt.
 With regard to the fourth element, that this murder was committed
in furtherance of the robbery and was one that should have been
anticipated as a result of carrying out the robbery, Gonzalez argues
that the present case is similar to a case from the Fort Worth Court
of Appeals, which held that no evidence existed to show that there was
a plan to harm the victim. See Tippitt v. State, 41 S.W.3d 316,
324–25 (Tex. App.—Fort Worth 2001, no pet.) (holding that the evidence
presented only showed an agreement to rob the victim, but not murder
him). We disagree with this argument and find the Tippitt case
readily distinguishable, as there is ample evidence to support the
jury’s finding on this element beyond a reasonable doubt. Gonzalez’s
“Statement of the Accused” disclosed details of the plans to rob
Cahue, which included a scheme to use force to tackle and subdue him,
as well as bind his hands and feet with duct tape. Throughout his
statement, Gonzalez contends that he felt threatened by his co-
defendants and was told by one of his friends that Wendy was capable
of hurting Gonzalez and his family. Marvin and Dr. Farley’s testimony
provided evidence of Cahue’s violent beating and death, which took
place during the course of the robbery. While the evidence may not
show that murder was in the original plans crafted by Gonzalez and
Wendy, the crime was nonetheless committed in furtherance of the
robbery, as the evidence shows that the original plans to tackle and
duct tape Cahue were foiled when the 76-year-old victim resisted his
attackers. The State’s evidence also shows that the group of co-
defendants entered Cahue’s trailer with a BB gun that resembled a real
pistol. Gonzalez further admitted, in his statement to police, to
being fearful of his co-defendant(s), including Wendy, who had an
apparent capability of hurting him and his family. The State argued
that Wendy’s propensity for anger and potential violence was within
Gonzalez’s knowledge and Cahue’s murder should have been anticipated
when the five teenagers entered Cahue’s home to commit the robbery
with a BB gun, duct tape, and the element of surprise. We agree and
conclude that the evidence, viewed in the light favorable to verdict,
was sufficient to allow the jury to draw reasonable inferences from
the evidence and support a finding of the fourth element beyond a
reasonable doubt. See Hooper v. State, 214 S.W.3d 9, 16–17 (Tex.
Crim. App. 2007).
 Gonzalez’s first issue is overruled.
 III. Issue Two: Refusal to Admit Evidence to Support Defensive Theory
 In his second issue, Gonzalez asserts that the trial court
committed reversible error when it denied him the ability to present
evidence on his defensive theory of independent impulse.
 A. Standard of Review and Applicable Law
 “A defendant has a fundamental right to present evidence of a
defense as long as the evidence is relevant and is not excluded by an
established evidentiary rule.” Miller v. State, 36 S.W.3d 503, 507
(Tex. Crim. App. 2001) (en banc) (citing Chambers v. Mississippi, 410
U.S. 284, 302 (1973)). The prevailing policy behind this rule and its
limits is to “assure both fairness and reliability in the
ascertainment of guilt and innocence.” Id. We review the trial
court’s decision to bar the admission of evidence to support
Gonzalez’s independent impulse defense under an abuse of discretion
standard. Id.
 For evidence to be relevant, it must satisfy two requirements:
(1) that it is material; and (2) that it is probative. See id.; Tex.
R. Evid. 401. To be material, it “must be shown to be addressed to
the proof of material proposition;” to be probative, the evidence must
“tend to make the existence of the fact ‘more or less probable than it
would be without the evidence.’” Miller, 36 S.W.3d at 507.
 B. Discussion
 Gonzalez argues that the trial court erred for not allowing
testimony to support his independent impulse defense. The independent
impulse defense “embraces the theory that the accused, although
admittedly intent on some wrongful conduct, did not contemplate the
extent of criminal conduct actually engaged in by his fellow
conspirators, and thus cannot be held vicariously responsible for
their conduct.” Fincher v. State, 980 S.W.2d 886, 888 (Tex. App.—Fort
Worth 1998, pet. ref’d).
 On an offer of proof, Gonzalez’s counsel proffered evidence
that Michael told McAllen Police Department crime-scene investigators
that Cahue bit his hand and that he knew that Cahue carried HIV.
While counsel argued—and the McAllen Police Department investigator’s
report apparently listed—that Cahue had AIDS, the record appears to
the contrary and instead indicates that the victim was only
potentially HIV-positive. Gonzalez’s counsel then argued that this
evidence would show that Michael murdered Cahue because Cahue bit him
and because Michael knew that Cahue carried HIV. Gonzalez’s counsel
argued further that these events were unforeseen. When questioned by
the trial court, the following colloquy took place:
 The Court: How does that hinder your defensive theory? I know
 that you’re arguing sudden impulse.

 [Defense counsel]: Well—
 The Court: I mean, how does that help you to prove your sudden
 impulse? I mean, sudden impulse, your
 whole case revolves around the fact that
 your client was not inside the—the house
 and that there was no plan as far as that
 they were going to kill him.

 [Defense Counsel]: Okay. That—that substantiates that. The
 killing came about because of the rage,
 which was also substantiated by the
 State’s own witness, the testimony of
 Marvin. He went into a rage when he was
 bitten because he knew that he had AIDS
 and this prompted them to kill. This was
 an unforeseen situation, could not have
 been foreseen by [Gonzalez] and, therefore
 we are entitled to a charge.

 The Court: I just don’t—I just don’t see it. I think that
 there’s too many assumptions to get into
 that.

 The trial court barred the evidence of Cahue’s possible HIV
condition because it found it irrelevant and too speculative for the
proceedings. We agree with the trial court’s determination. The
proffered evidence is irrelevant and does not support Gonzalez’s
defensive theory because all it shows is that Cahue bit Michael, as
the victim attempted to defend himself, and that Michael knew of
Cahue’s possible HIV infection. We fail to follow Gonzalez’s position
that this evidence is enough to support his defense of independent
impulse, because the excluded evidence is immaterial, lacks probative
value, and is highly speculative of Michael’s motives, if any. See
Tex. R. Evid. 403. We agree with the trial court that the strongest,
and perhaps only, evidence in this case that would tend to support
Gonzalez’s theory of independent impulse is Michael’s direct testimony
about what his specific knowledge and intent were following the bite.
However, co-defendant Michael did not testify at Gonzalez’s trial.
Accordingly, we conclude that the trial court did not abuse its
discretion in barring this testimony, as it was irrelevant to the
proposed reasons for its offer and highly speculative. See Tex. R.
Evid. 401; Miller, 36 S.W.3d at 507. Gonzalez’s second issue is
overruled.
 IV. Issue Three: Jury Charge on Law of Principals
 In his third issue, Gonzalez asserts that the trial court erred
in providing a jury instruction on the law of principals when there
was insufficient evidence to support the charge.
 A. Standard of Review
 Our first duty in analyzing a jury-charge issue is to determine
whether error exists. See Ngo v. State, 175 S.W.3d 738, 743 (Tex.
Crim. App. 2005) (en banc). If we find error, we analyze it for harm.
 Id. The degree of harm necessary for reversal depends on whether the
error was preserved by objection. Id. If the error was preserved by
objection, we will reverse if we find “some harm” to the defendant’s
rights. Id. If no objection was made, we will reverse only if the
record shows “egregious harm” to the defendant. Id.
 B. Discussion
 Gonzalez argues that the charge erroneously instructed the jury
to convict him if, among other instructions, they found him culpable
as the primary actor for the crimes of capital murder, murder, and
aggravated robbery. We agree.. Upon review of the record, we found
no evidence to support the principal-actor instructions with regard to
Gonzalez’s actions and thus conclude that the principal-actor
instructions were erroneous. See Goff v. State, 931 S.W.2d 537, 544
(Tex. Crim. App. 1996) (en banc) (holding that the State is required
to properly instruct the jury if it proceeds upon parties theory).
 Because these instructions were erroneous, we must analyze for
harm. See Ngo, 175 S.W.3d at 743. Gonzalez’s appellate brief
stipulates that defense counsel did not object at trial to any portion
of the jury instruction, so we examine whether this error amounted to
egregious harm that requires reversal. See id. Gonzalez argues that
he was egregiously harmed because the effect of the trial court’s
erroneous instruction confused the jury, left the possibility open
that the jury found him guilty as a principal actor, and/or caused
egregious harm to the defendant to deny him a fair and impartial
trial. We disagree. Egregious harm is defined as those errors that
affect “‘the very basis of the case,’ ‘deprive the defendant of a
valuable right,’ or ‘vitally affect a defensive theory.’” Ngo, 175
S.W.3d at 750.
 Our review of the record reveals that the evidence adduced at
trial would not support a verdict against Gonzalez as a principal
actor, but rather supports a verdict against Gonzalez under the law of
parties; therefore, any error by the trial court in charging Gonzalez
as a primary actor, when the evidence supports his guilt under the law
of parties, and the jury was instructed as such, is harmless. See
generally Ladd v. State, 3 S.W.3d 547, 564–65 (Tex. Crim. App. 1999);
see also Black v. State, 723 S.W.2d 674, 675 (Tex. Crim. App. 1986)
(en banc) (holding the inverse, that trial court’s instruction on law
of parties was harmless because the evidence clearly supported
defendant’s guilt as a principal actor). Furthermore, confusion of
the jury, if any, was likely minimal because the law-of-parties
instruction accompanied the primary-actor instruction. The record
does not indicate that these erroneous instructions were placed in the
jury charge so as to injure Gonzalez’s rights, and we also conclude
from our review that this error did not deny him a fair and impartial
trial. See Reyes v. State, 741 S.W.2d 414, 426 (Tex. Crim. App. 1987)
(en banc) (citing Carrillo v. State, 566 S.W.2d 902, 910 (Tex. Crim.
App. 1978).[1] Accordingly, any error by the trial court in its
instructions to the jury on the primary-actor theory was harmless.
 We overrule Gonzalez’s third issue.
 V. Issue Four: Mentioning Punishment During Closing Arguments
 In his fourth issue, Gonzalez contends that the trial court
committed reversible error when it prohibited his attorney from making
closing arguments that Gonzalez faced mandatory life imprisonment
without parole if found guilty of capital murder.
 A. Standard of Review and Applicable Law
 In a capital murder trial in which the State does not seek the
death penalty, prospective jurors shall be informed that the State
will not seek the death penalty and that a sentence of life
imprisonment without parole is mandatory on conviction. See Tex. Pen.
Code Ann. § 12.31(b)(2). However, it is improper during the guilt-
innocence stage of a trial involving two or more offenses to discuss
ranges of punishment because it encourages the jury to convict on the
basis of the amount of punishment, rather than facts surrounding guilt
or innocence. See Bruton v. State, 921 S.W.2d 531, 536 (Tex.
App.—Fort Worth 1996, writ ref’d). Generally, an improper discussion
of ranges of punishment during closing arguments may be sufficiently
cured and remedied by a limiting instruction, unless the argument was
so manifestly improper to inflame and prejudice the minds of the jury.
 Id.
 B. Discussion
 The following exchange is at the crux of Gonzalez’s issue on
appeal.
 [DEFENSE COUNSEL]: The law of parties is what the State will
 have you convict Hazael Gonzalez of
 the crime of Capital Murder causing
 this judge to sentence him to life in
 the penitentiary.

 [PROSECUTOR]: Your honor, I’m going to object, Judge.
 Improper argument.

 THE COURT: Sustained, [Defense Counsel]. Ladies and
 gentlemen, the only issue before you
 is guilt or innocence.

 . . . .
 THE COURT: Remember what I told you that what the lawyers
 say is not evidence.

 The trial court’s ruling during this exchange was not erroneous.
We hold that the trial court properly sustained the State’s objection
and properly cured the improper argument by admonishing the jury that
their sole role was to determine Gonzalez’s guilt or innocence and
that counsel’s argument was not evidence to be taken into
deliberations. See id.
 Furthermore, the record shows that during voir dire, prospective
jurors were informed by the trial court, pursuant to statute, of the
State’s decision not to seek the death penalty and decision to pursue
life imprisonment without parole instead if the jury found Gonzalez
guilty of capital murder. See Tex. Pen. Code Ann. § 12.31(b)(2).
Gonzalez cites no authority, and we find none, to support his argument
that the court was required to instruct the jury in its charge of the
possible mandatory punishment. Instead, our reading of the penal code
requires that only prospective jurors need be informed of the possible
life imprisonment without parole punishment, which was satisfied in
this case. See id. Because we do not find error, our analysis on
this issue concludes here. See Tex. R. App. P. 44.2.
 Gonzalez’s fourth issue is overruled.
 VI. Issue Five: Admission of Autopsy Photos
 In his final issue, Gonzalez argues that the trial court
committed reversible error when it admitted photos of the victim’s
autopsy.
 A. Standard of Review
 Admissibility of photographs is within the sound discretion of
the trial court. See Paredes v. State, 129 S.W.3d 530, 539 (Tex.
Crim. App. 2004). Generally, a photograph is admissible if verbal
testimony about the matters in the photograph is also admissible. Id.
 We will review the trial court’s ruling for an abuse of discretion.
Id. A trial court’s ruling on admissibility of evidence should not be
disturbed if the ruling was within the zone of reasonable
disagreement, and we should not substitute our own decision for that
of the trial court. See Moses v. State, 105 S.W.3d 622, 627 (Tex.
Crim. App. 2003).
 B. Discussion
 Gonzalez argues that at trial, he objected to autopsy photos
(State’s Exhibits 101, 102, 104–11) first on relevance grounds, and in
the alternative, on rule of evidence 403 grounds. See Tex. R. Evid.
401, 403. The trial court overruled all of Gonzalez’s objections and
admitted the photographs. First, relevant evidence, as defined
earlier in this opinion, is “evidence that has a tendency to make the
existence of any fact that is of consequence to the determination of
the action more probable or less probable than it would be without the
evidence.” Tex. R. Evid. 401. The photographs at issue depict
matters that Dr. Farley testified to about the manner and method of
Cahue’s death, including lacerations to Cahue’s head, hemorrhaging of
blood in the head and chest, and fractured rib bones. Gonzalez argues
that the photos lack relevance because he did not challenge the cause
of death. While it is accurate that Gonzalez’s counsel agreed to
stipulate to Cahue’s cause of death, the State nonetheless had the
burden to prove to the jury the manner and method of Cahue’s death,
which it elicited through Dr. Farley’s testimony. See Reese v. State,
33 S.W.3d 238, 240 (Tex. Crim. App. 2000). We hold that the trial
court did not abuse its discretion by finding the autopsy photographs
relevant in this case.
 Next, we examine whether the trial court abused its discretion by
ruling that the probative value of the photographs substantially
outweighed the danger of unfair prejudice to support their admission
into evidence. Gonzalez contends that the photos are more prejudicial
than probative because they depict the bloody, bruised, and gruesome
state of the victim’s body at the time of the autopsy. Further,
Gonzalez argues that the photos served more to inflame the jury rather
than assist them in any relevant part of the trial. We disagree. “A
court may consider many factors in determining whether the probative
value of photographs is substantially outweighed by the danger of
unfair prejudice. These factors include: (1) the number of exhibits
offered; (2) their gruesomeness; (3) their detail; (4) their size; (5)
whether they are in color or black-and-white; (6) whether they are
close-up; (7) whether the body depicted is clothed or naked; (8) the
availability of other means of proof; and (9) other circumstances
unique to the individual case.” Williams v. State, 301 S.W.3d 675,
690 (Tex. Crim. App. 2009). The ten photographs at issue were not
any more gruesome than what would be expected in a case such as this,
where Dr. Farley testified that Cahue’s cause of death was repeated
blunt force trauma to the head and abdomen. Further, the photographs
tracked Dr. Farley’s testimony that presented a clinical examination
and autopsy of Cahue’s body following his death. Gonzalez’s argument
that the photos were unfairly prejudicial is not persuasive in light
of the State’s need for the photographs to prove its case. The photos
depicted Cahue’s bloody and bruised face and were vital to the State’s
case to the jury with regard to the manner and method of Cahue’s
death. We have reviewed these photographs and conclude that the trial
court’s ruling was within the zone of reasonable disagreement and that
it did not abuse its discretion in admitting them. See id.; see also
Tex. R. Evid. 403. Gonzalez’s fifth issue is overruled.
 VII. Conclusion
 We affirm the judgment of the trial court.

 ________________________
 GINA M. BENAVIDES,
 Justice

Do not publish.
Tex. R. App. P. 47.2(b).

Delivered and filed the
2nd day of February, 2012.

 -----------------------
[1] Gonzalez’s reliance on two cases for support are distinguishable
from the present case. In Savant v. State, defense counsel timely
preserved error at trial, which was not done in this case, and
requires a “some harm,” rather than “egregious harm” analysis under
Ngo; and in Oliver v. State, the trial court provided a limited
instruction that was not supported by the evidence, which was also not
done in this case because instructions on the law of parties were
nonetheless provided to the jury. See Savant v. State, 544 S.W.2d
408, 409 (Tex. Crim. App. 1976); Oliver v. State, 268 S.W.2d 467, 470
(Tex. Crim. App. 1954).