

# NUMBER 13-24-00267-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

EDUARDO ACEVES A/K/A
EDUARDO RODRIGUEZ ACEVES,                                    Appellant,

v.

THE STATE OF TEXAS,                                          Appellee.

---

## ON APPEAL FROM THE 103RD DISTRICT COURT
## OF CAMERON COUNTY, TEXAS

---

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices West and Fonseca**
**Memorandum Opinion by Justice Fonseca**

Appellant Eduardo Aceves a/k/a Eduardo Rodriguez Aceves was convicted of murder, a first-degree felony, and was sentenced to twenty-five years' imprisonment. *See* TEX. PENAL CODE ANN. § 19.02. On appeal, he argues: (1) the trial court erred by excluding a statement made by his co-defendant to a magistrate; (2) the evidence was insufficient

to support a finding of guilt under the law of parties; and (3) his right to due process was violated because no rational trier of fact could have found him guilty beyond a reasonable doubt. We affirm.

## I. BACKGROUND

In the early hours of October 17, 2020, the Harlingen Police Department (HPD) received a call about a man walking on the side of the road who appeared to be heavily bleeding. When officers arrived, they saw that Maurice Hunter had several lacerations on his body, and his shirt was soaked in blood. Hunter told police that a male subject came to his house, opened the door, and "began to stab him." Officers went to Hunter's house, which was nearby where he was found, and they saw drops of blood around the front porch, the front door, and throughout the living room adjacent to the entrance. As officers were securing Hunter's house, Aceves and his niece Ashley drove up and asked the officers what was going on. Aceves told the officers he lived in the same house as Hunter.

Hunter was transported to Valley Baptist Medical Center, where he underwent emergency surgery. He succumbed to his injuries and was pronounced dead nine days later. The medical examiner testified that Hunter had ten stab wounds on his arms and torso, including one in his upper abdomen which passed through his liver and two major blood vessels and caused his death by exsanguination.

Ashley testified that her mother is Norma Aguilar, Aceves's sister. Since 2007, Ashley and Hunter had been in a sporadic romantic relationship, and they had two children together. Ashley said that she "was done with [Hunter]" as of June 2020, but "he kept coming around" her house and texting her. Meanwhile, Ashley had begun a sexual relationship with Juan Lozano. At one point, Hunter found out from a Facebook post that

2

Ashley and Lozano were dating, and he commented, "What the hell? That's my woman." Later, Hunter and Lozano "went back and forth" with messages on Facebook.

At around 9:00 p.m. on the evening of the stabbing, Aguilar and her boyfriend Angel Pizano came to Ashley's house, and then left to celebrate Pizano's birthday at a bar. Pizano returned from the bar alone around midnight, at which time Aceves and Lozano were at Ashley's house. Pizano told Ashley that he and Aguilar "were arguing and that . . . he dumped her off the car and then did like a little turn around the block and she was gone." Pizano was agitated and angrily demanded to know Aguilar's whereabouts. According to Ashley, Pizano "hit" Aceves's car, "pinned [Aceves] against his truck," and repeatedly stated that he "felt like stabbing" someone. Pizano also said he wanted to check Aceves's apartment—where Hunter often stayed—to see if Aguilar was there.

Eventually, at around 1:45 a.m., Pizano, Lozano, and Aceves departed in Pizano's car, ostensibly in order to obtain cocaine. Aceves was driving. Ashley said she feared for her uncle's safety because both Pizano and Lozano had previously gotten into fights with him. She said she knew Lozano had a knife that evening because she noticed one was missing from her kitchen.

About ten minutes after the men left, Aceves called Ashley and told her that he had exited the car to purchase the drugs, but had forgotten to bring the money, and when he came back to the car to get it, Lozano and Pizano had already left. Ashley agreed to go pick up her uncle at the drug dealer's house. When Aceves got into Ashley's car, he said: "I heard some sirens. Take me to the house. These mother f[***]ers better have not done s[***] at my house. . . . Man, I hope Norma wasn't there." Ashley testified that, when they arrived at Aceves's apartment, officers informed them that Hunter had been stabbed.

3

According to Ashley, Aceves later instructed her to tell police that he never left her house that evening because he did not want the drug dealer to get in trouble. The next day, she told police that Lozano and Pizano did the stabbing, but Aceves could not have because he was at her house the entire time. Ashley later admitted that Aceves had left her house with the other men to obtain drugs, though she still denied that he was at the scene of the stabbing. Subsequently, after Aceves was arrested and incarcerated, he admitted to Ashley over the phone that he "was there" at the time of the stabbing.

On cross-examination, Ashley stated that people in her neighborhood are "[v]ery afraid" of Aceves's drug dealer because "[he] and his brothers" "will kill you if you mess up" or "go after [your] kids," "[e]specially if you're snitching on them." She agreed that Aceves was also afraid of him.

Ashley said that Aceves was the one who introduced her to Hunter in 2007, that Aceves and Hunter were "always together," and that Hunter would call Aceves "Tio." She never saw Aceves and Hunter fight; to the contrary, Aceves would take Hunter's side when she and Hunter got into an argument.

The lead investigator, Sergeant Jeff Harlan of the Harlingen Police Department, testified that he interviewed Pizano on the night of the stabbing. Pizano told Harlan that he wanted to go to Aceves's house that night to look for Aguilar, and that he asked Aceves to drive because Pizano had been drinking. When they arrived at Aceves's house, Hunter told them Aguilar was not there, and Hunter invited Pizano inside to look for himself. Pizano told Harlan that, after he went inside the house, the door opened again, and Lozano entered and started fighting Hunter. Harlan said that he also interviewed Lozano, and that Lozano confessed to the stabbing and said "the other two had nothing to do with

4

it." Lozano told Harlan that, after the stabbing, Hunter "took off running" while Lozano returned to Pizano's car and the group departed.[1] Finally, Harlan interviewed Aceves. According to Harlan, Aceves admitted that he drove the men to obtain drugs but "vehemently denied" that he drove them to his residence that night.

Lozano, Pizano, and Aceves were all arrested and charged with Hunter's murder. When asked on cross-examination why Aceves was arrested, Harlan explained:

> Just with the other two interviews, that he was the driver, him also being there, knowing that [Lozano] and [Hunter] do not get along, he also knew that [Pizano] was in that rage and wanted to fight, he fought with him, that he wanted to go stab somebody, and then, of course, when he got in the car and drove, he had the opportunity not to drive to his house, but yet, he still did.

Harlan conceded that he was unaware that, to be convicted as a party to an offense, "you have to have the same intent as the other people that are acting." He agreed that, in this case, Aceves was "merely present" at the scene of the offense, and he did not know of any evidence indicating Aceves "wanted to hurt" Hunter. On re-direct examination, Harlan agreed that "l[ying] repeatedly" to police could be considered "evidence of . . . intent."

Officer Joel Yanes testified that he and Commander Jose Luis Garcia interviewed Aceves at the police station on October 20, 2020. A video recording of the interview was entered into evidence and played for the jury without objection. According to Yanes, Aceves stated in the interview that on the night of the stabbing, "[Pizano] was very amped up, very angry, very upset, and . . . [Pizano] had believed that [Aguilar] was with [Hunter], so [Pizano] was going to go stab [Aguilar] and [Hunter] when he found them together." Aceves admitted during the interview that he drove Pizano and Lozano to and from his

---

[1] According to Harlan, police recovered Pizano's car and discovered a "slice" in the headliner with Hunter's blood on it.

house on the night of the stabbing, and that he knew Hunter would be there. He also appeared to admit that he knew Pizano had a small knife on his person that evening. At one point during the interview, Aceves stated: "I know I'm not guilty of the assault, but I would say this: I shouldn't have f[***]ing helped."

At the close of the State's case-in-chief, the trial court denied defense counsel's motion for directed verdict. Outside the presence of the jury, defense counsel explained that he had intended to call Lozano and Pizano as witnesses, but that Lozano indicated his intent to plead his Fifth Amendment rights, and Pizano was also unwilling to testify. Defense counsel then sought to introduce into evidence a video recording of the hearing during which Lozano was magistrated after his arrest. In the video recording, Lozano informed the magistrate that the stabbing was "something that just spontaneously happened on my behalf" and that Aceves and Pizano "had nothing to do with it." The trial court denied the request to admit the exhibit as evidence at trial, and the defense rested without calling any witnesses.

The jury was instructed on the law of parties under Texas Penal Code § 7.02(a)(2). *See* TEX. PENAL CODE ANN. § 7.02(a)(2). Aceves was convicted of murder[2] and this appeal followed.

## II.    SUFFICIENCY OF THE EVIDENCE

Aceves's second and third issues both challenge the sufficiency of the evidence to support his conviction. If sustained, these issues would result in reversal and rendition of judgment of acquittal. *Lopez v. State*, 615 S.W.3d 238, 248 (Tex. App.—El Paso 2020,

---

[2] The jury acquitted Aceves of one count of engaging in organized criminal activity. *See* TEX. PENAL CODE ANN. § 71.02.

pet. ref'd). Accordingly, we address these issues first. *See, e.g.*, *Hernandez v. State*, 268 S.W.3d 176, 178 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.) (addressing appellant's sufficiency issue first "because it affords him the greatest relief if sustained"); *see also* TEX. R. APP. P. 43.3.

## A.      Standard of Review and Applicable Law

To satisfy constitutional due process requirements, a criminal conviction must be supported by sufficient evidence. *Baltimore v. State*, 689 S.W.3d 331, 340 (Tex. Crim. App. 2024). "Evidence supporting a conviction is legally sufficient if a rational trier of fact could have found that the defendant committed each element of the offense beyond a reasonable doubt." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In a sufficiency review, we view the evidence in the light most favorable to the verdict and consider all of the admitted evidence. *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020). "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses"; therefore, "[w]hen the jury could reasonably draw conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict." *Id.*; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04.

"Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt." *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013). The question we must ask is whether, based upon the cumulative force of all of the evidence, the necessary inferences made by the jury are reasonable. *Griffin v. State*, 491 S.W.3d 771, 774 (Tex. Crim. App. 2016); *Hooper v. State*, 214 S.W.3d 9, 17 (Tex. Crim. App. 2007). "[J]uries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or

presumptions." *Hooper*, 214 S.W.3d at 15. "Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Id.* at 16. On the other hand, "an inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id.* "A conclusion that is reached by speculation may not seem completely unreasonable, but it is not sufficiently based on facts or evidence to support a conviction beyond a reasonable doubt." *Gross v. State*, 380 S.W.3d 181, 188 (Tex. Crim. App. 2012).

Sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). A hypothetically correct charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* (quoting *Malik*, 953 S.W.2d at 240). "The law 'authorized by the indictment' consists of the statutory elements of the offense as modified by the indictment allegations." *Id.*

A hypothetically correct jury charge consistent with the indictment and the evidence in this case would instruct the jury to find Aceves guilty of murder if, by stabbing Hunter with a knife: (1) he intentionally or knowingly caused Hunter's death; or (2) with intent to cause serious bodily, he committed an act clearly dangerous to human life which caused Hunter's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2). A person acts intentionally with respect to the result of his conduct when it is his conscious objective or desire to cause the result. *Id.* § 6.03(a). A person acts knowingly with respect to the result

of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

**B.     Law of Parties**

A hypothetically correct jury charge would also instruct the jury that, under the law of parties, Aceves is criminally responsible for an offense committed by another person if, "acting with intent to promote or assist the commission of the offense, he solicit[ed], encourage[ed], direct[ed], aid[ed], or attempt[ed] to aid the other person to commit the offense." *Id.* § 7.02(a)(2). Additionally,

> [i]f, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*Id.* § 7.02(b).

"To determine whether an individual is guilty as a party to an offense, the reviewing court may look to 'events before, during, and after the commission of the offense.'" *Gross*, 380 S.W.3d at 186 (quoting *Wygal v. State*, 555 S.W.2d 465, 468–69 (Tex. Crim. App. 1977)). "A court may also rely on circumstantial evidence to prove party status." *Id.* (citing *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1996)). "There must be sufficient evidence of an understanding and common design to commit the offense." *Id.*; *see Cosper v. State*, 685 S.W.3d 196, 205 (Tex. App.—Corpus Christi–Edinburg 2024, pet. ref'd). Each fact need not point directly to the guilt of the defendant, as long as the cumulative effect of the facts are sufficient to support the conviction under the law of parties. *Gross*, 380 S.W.3d at 186 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

9

**C.    Analysis**

Viewed in the light most favorable to the jury's verdict, the evidence established that Aceves drove Lozano and Pizano to Aceves's residence, and shortly thereafter, Lozano intentionally stabbed Hunter, causing Hunter's death. By driving the men to his residence, Aceves "aid[ed]" Lozano in committing the offense. *See* TEX. PENAL CODE ANN. § 7.02(a)(2). The parties dispute, however, whether Aceves was "acting with intent to promote or assist the commission of the offense" when he did so. *See id.*

Intent may generally be inferred from circumstantial evidence such as acts, words, and the conduct of the accused. *Guevara*, 152 S.W.3d at 50. In his brief, Aceves notes correctly that the "mere presence of a person at the scene of a crime, or even flight from the scene, without more, is insufficient to support a conviction as a party to the offense." *Gross*, 380 S.W.3d at 186 (citing *Thompson v. State*, 697 S.W.2d 413, 417 (Tex. Crim. App. 1985)). He emphasizes that, according to the evidence, he was close friends with Hunter and had no reason to want him killed, whereas Lozano had a motive to harm Hunter because of their relationships with Ashley. Aceves also notes that Pizano physically assaulted him shortly prior to stabbing Hunter, and he contends without reference to authority or the record that "[t]his was part of the duress that forced [Aceves] to go with them to his apartment." He further points to Harlan's testimony that Harlan knew of no evidence that Aceves intended to harm Hunter.

In support of his argument, Aceves cites *Gross v. State* and *Tippitt v. State*, two cases in which courts found insufficient evidence to support conviction as a party to murder under § 7.02(a)(2). In *Gross*, the appellant and his brother-in-law Jones were driving in appellant's truck when they got into a verbal altercation with Lee, another

motorist. 380 S.W.3d at 183. After both vehicles stopped at a gas station parking lot, Jones exited the truck and fatally shot Lee. *Id.* Gross and Jones then departed the scene in the truck, and Gross later dropped Jones off, along with the shotgun, at Jones's grandmother's house. *Id.* The Texas Court of Criminal Appeals held that this evidence was insufficient to convict Gross as a party to murder, noting that "post-offense conduct" cannot alone "establish an understanding or common scheme to commit a crime." *Id.* at 188; *see id.* at 186 ("Although [Gross]'s post-offense activity could support a charge of hindering apprehension or prosecution, the evidence of his involvement in the shooting is legally insufficient to support a conviction for murder under the law of parties."). Instead, there must be evidence of a "prior or contemporaneous plan" to commit the offense. *Id.* at 188.

In *Tippitt*, the appellant and his associate Whitaker went to the house of the victim, Heath, where Whitaker shot and killed Heath. *Tippitt v. State*, 41 S.W.3d 316, 320 (Tex. App.—Fort Worth 2001, no pet.), *abrogated on other grounds by Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007). Evidence showed that Whitaker was "known for . . . robbing people" and that Tippitt had suggested robbing Heath earlier in the day. 41 S.W.3d at 319. The Fort Worth Court of Appeals held this was insufficient to show Tippitt's guilt as a party to murder under § 7.02(a)(2) because "the evidence of a prior agreement viewed in the light most favorable to the verdict only established a plan to *rob* Heath and not to *murder* him." *Id.* at 324. Moreover, the evidence was insufficient to convict Tippitt as a party under § 7.02(b) because "there was no evidence to establish [his] knowledge of Whitaker's violent propensities." *Id.* at 325.

In its response to this issue, the State relies principally on the video recording of

11

Aceves's interview with Yanes and Garcia on October 20, 2020.[3] During the interview, Aceves told officers that, when Pizano returned to Ashley's house at around midnight on October 17, Pizano said, "Let's go to your house, I better not find Norma with Mo there or I'll stab them both to death. I'll kill them. I want to kill." Aceves also conceded that he knew Pizano had a knife at the time, he knew there was animosity between Lozano and Hunter because of their relationships with Ashley, and he knew that Hunter would be at his residence.[4]

We agree with the State that the jurors could have reasonably inferred Aceves's culpable intent from this evidence. Aceves argues that, though his "actions in the immediate aftermath of the stabbing may seem suspicious to the police," they cannot show his guilt as a party because they occurred after the offense took place. The *Gross* Court held that "post-offense conduct" cannot alone "establish an understanding or common scheme to commit a crime." 380 S.W.3d at 188. However, it is well-established that events occurring after the offense are properly considered when determining the party status of an accused. *See id.* at 186; *Wygal*, 555 S.W.2d at 468–69. In any event,

---

[3] The thirty-minute interview was conducted partly in Spanish, and the audio in the recording is of poor quality. No transcript or translation of the interview appears in the record. Though the State cites the video extensively in its argument, it does so only generally and never provides any timestamps or other specific indications as to where material may be found in the video.

[4] Aceves does not address the October 20, 2020 interview in his initial brief. In his reply brief, Aceves argues:

> The [State] attempts to overcome a lack of evidence under the law of parties by misconstruing a single statement of [Aceves] as a confession. They cite a portion of a lengthy interrogation . . . in which [Aceves] repeatedly denies guilt of assaulting his friend. They seize upon his language, "I know I'm not guilty of the assault, but I would say this: I shouldn't have f[***]ing helped." However, in the next question [Aceves] explains, "I think I could have arrested him when he assaulted me . . . ." [Aceves] makes clear that[,] had he had [Lozano] arrested after he himself had been assaulted, [Lozano] could not have followed through on his later actions.

We note that, according to the evidence, Pizano—not Lozano—assaulted Aceves prior to the stabbing. In any event, aside from this paragraph, Aceves does not dispute the State's characterization of the statements he made during his October 20, 2020 interview.

the evidence in this case showed not only that Aceves drove Lozano and Pizano *away* from the crime scene, but also that he drove them *to* the scene, before the murder, knowing full well that Pizano had just expressed his desire to kill Hunter and was armed with a knife. The evidence of pre-offense conduct relevant to Aceves's intent distinguishes this case from *Gross*. *Cf.* 380 S.W.3d at 188. Aceves consistently stated during his interactions with police that he drove the men to his house solely for the purpose of finding Aguilar. However, it was jurors' prerogative to disbelieve these statements. *See Stahmann*, 602 S.W.3d at 577. Viewed in the light most favorable to the verdict, the evidence allowed a reasonable juror to logically conclude that, by driving the men to his house, Aceves intended to assist or promote the offense. The evidence was sufficient to convict Aceves as a party under § 7.02(a)(2). *See* TEX. PENAL CODE ANN. § 7.02(a)(2).

Further, though the parties do not address the issue, we note that under § 7.02(b), Aceves is responsible for the murder, notwithstanding his lack of intent to cause Hunter's death, if he engaged in a conspiracy with Pizano and Lozano to commit a felony, and Hunter's murder was committed in furtherance of that conspiracy and was a result that should have been anticipated therefrom. *See id.* § 7.02(b). Thus, contrary to defense counsel's representation during his cross-examination of Harlan, the State did not need to prove that Aceves necessarily had the "same intent" as Lozano and Pizano. Here, the jury could have reasonably concluded that the men conspired to cause felonious harm to Hunter and, given the evidence of the other men's ill feelings toward Hunter and Pizano's stated desire to kill Hunter, that murder should have been anticipated as a result of carrying out the conspiracy. *See id.* The evidence that Aceves was aware of Pizano's murderous rage makes this case distinguishable from *Tippitt*. *Cf.* 41 S.W.3d at 325.

Finally, the fact that Aceves lied to police in the days following the stabbing, and that he asked Ashley to lie on his behalf, support the jury's finding concerning his intent. According to Ashley, Aceves initially gave false information to police regarding his whereabouts on the night of the stabbing only because he was afraid of his drug dealer and did not want to get the drug dealer in trouble. Again, the jury was entitled to disbelieve this testimony, and instead, to reasonably infer that Aceves lied because he had a consciousness of guilt related to the stabbing. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (holding that making false statements to police is evidence indicating consciousness of guilt); *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.) (holding that conduct after crime indicating defendant's consciousness of guilt is "one of the strongest kinds of evidence of guilt"); *see also Stahmann*, 602 S.W.3d at 577.

For the foregoing reasons, we overrule Aceves's second and third issues.

### III.    EVIDENTIARY RULING

By his first issue, Aceves contends that the trial court erred by denying his request to admit the video recording of Lozano's magistration hearing. "We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard, and we must uphold the trial court's ruling if it was within the zone of reasonable disagreement." *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020).

Aceves argues that the subject video recording was admissible under various exceptions to the rule against hearsay. *See* TEX. R. EVID. 803(8)(iii) (hearsay exception for "factual findings from a legally authorized investigation"), 803(24) (hearsay exception for statements against the declarant's proprietary or pecuniary interest), 804(b)(1)(B)

14

(hearsay exception for former testimony by a declarant who is unavailable as a witness). He also contends that the exclusion of the evidence raises "issues of fundamental fairness" under federal constitutional principles. *See Spencer v. Texas*, 385 U.S. 554, 563–64 (1967) ("[T]he Due Process Clause guarantees the fundamental elements of fairness in a criminal trial."); *Woods v. Estelle*, 547 F.2d 269, 271 (5th Cir. 1977) (noting that federal courts have granted habeas relief "where the violation of a state's evidentiary rule has resulted in a denial of fundamental fairness").

As Aceves correctly notes, his counsel "present[ed] the proffer, explain[ed] its relevance, and not[ed his] objection to its exclusion" at trial. However, "[i]n order to have evidence admitted under a hearsay exception, the proponent of the evidence must specify which exception he is relying upon." *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002); *see Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005) ("[I]t is not enough to tell the judge that evidence is admissible. The proponent, if he is the losing party on appeal, must have told the judge why the evidence was admissible."); *Clark v. State*, 881 S.W.2d 682, 694 (Tex. Crim. App. 1994) ("As appellant did not sufficiently clearly expressly offer the evidence for the purpose which he now claims on appeal, such is not a basis for complaint on appeal."); *see also* Tex. R. App. P. 33.1(a).

At trial, defense counsel did not argue to the trial court that the recording was admissible as an exception to the rule against hearsay, nor did he make any argument which could be construed as referring to any such exception. Further, he did not allege that the admission of the evidence was necessary to protect his constitutional right to a fair trial. Instead, when asking the court to admit the exhibit, counsel stated:

> This, the Court has seen in the trial of Juan Lozano. This is the magistrate hearing, which I'm arguing is a public hearing held out to the public on

15

closed-circuit TV in Harlingen, Texas, for all to see. So it's in the stream of public domain. I wanted—sort of like a newspaper would be. I wanted to get it into evidence.

We agree with the State that, under these circumstances, no error has been preserved. *See Reyna*, 168 S.W.3d at 177; *Willover*, 70 S.W.3d at 845; *Clark*, 881 S.W.2d at 694; *see also* TEX. R. APP. P. 33.1(a); *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014) ("Failure to object at trial may waive even constitutional errors."). Aceves's first issue is overruled for that reason.

### IV.    CONCLUSION

The trial court's judgment is affirmed.

YSMAEL D. FONSECA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
31st day of July, 2025.